**FILED**

JUL - 8 2002

U. S. DISTRICT COURT
EASTERN DISTRICT OF. MO
·- ST. LOUIS ·-

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

IN RE BANKAMERICA          )
CORP. SECURITIES           )          **MDL No. 1264**
LITIGATION                 )

## ORDER

Before the Court is a motion to approve the proposed settlement agreement

filed on March 8, 2002 (Doc. 485) as fair, reasonable and adequate.  Also before the Court

are various documents filed by the parties in support of the settlement and by objectors in

opposition thereto.  The Court issued an Order preliminarily approving the settlement on

April 5, 2002 (See Doc. 458) and held a hearing on May 30, 2002.  The matter then was

taken under submission.

I.     **History of the Litigation**

This dispute arises out of the merger of NationsBank corporation, a North

Carolina corporation ("NationsBank"),[1] and old BankAmerica, a Delaware corporation

("BankAmerica"), in a stock-for-stock transaction. Defendant Bank of America, a Delaware

corporation, was formed upon the merger of NationsBank and BankAmerica. At all relevant

times, the common stock of NationsBank, BankAmerica and Bank of America was listed for

trading on the New York Stock Exchange and other stock exchanges, and each company had

securities registered with the United States Securities and Exchange Commission ("SEC")

---

[1]NationsBank was a North Carolina corporation until September 25, 1998, when it
reincorporated in Delaware.

pursuant to § 12(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and was subject to the reporting requirements of § 13 of the Exchange Act.

After mutual due diligence, NationsBank and BankAmerica signed a merger agreement on April 10, 1998, and publicly announced the proposed merger on April 13, 1998. The merger agreement provided, among other things, for the exchange of 1.1316 shares of NationsBank common stock for each share of BankAmerica common stock, and was conditioned, among other things, upon approval by the holders of a majority of outstanding stock of each company entitled to vote on the merger. This exchange rate was based on the relative stock prices of the two banks at the close of business on April 9, 1998.

On August 4, 1998, NationsBank filed a Form S-4 Registration Statement with the SEC to register the common stock to be issued in the merger. The Registration Statement included a Joint Proxy/Prospectus issued by both banks to solicit shareholder approval of the merger. The Proxy/Prospectus described the merger as a "merger of equals" in which no premium would be paid to either side. The term "merger of equals" was explained as shared control of the combined entity by shareholders of both banks. In support of this contention, the Proxy/Prospectus stated that the board of directors of the combined entity would contain 11 directors from NationsBank and 9 from BankAmerica. Further, the document stated that Hugh L. McColl, Jr., then Chairman and Chief Executive Officer of NationsBank, would be Chairman and CEO of Bank of America, and that David M. Coulter, then CEO of BankAmerica, would become President of the combined bank. Additionally, the

2

Proxy/Prospectus represented that it was the "present intention" of defendants that Coulter would succeed McColl as Chairman and CEO of Bank of America.

On or about August 13, 1998, NationsBank and BankAmerica mailed the proxy statement and forms of proxy to their respective shareholders entitled to receive notice of the special meeting to be held on September 24, 1998, to consider and vote on the Merger and related matters.  On August 28, 1998, BankAmerica issued a press release reporting on certain developments affecting its trading results, and filed a press release with the SEC on Form 8-K.  On September 15, 1998, BankAmerica issued another press release reporting anticipated results for the third quarter of 1998, and NationsBank issued a press release reaffirming its support of the merger.  BankAmerica filed its September 15 press release with the SEC on Form 8-K.

On September 24, 1998, the shareholders of each company approved the merger.  The merger was completed on September 30, 1998, and was publicized by Bank of America at an October 1, 1998 press conference.

On October 14, 1998, Bank of America announced its combined results for the quarter ending September 30, 1998, and filed the October 14 announcement with the SEC on Form 8-K.  At the end of the October 14 trading day, Bank of America's common stock closed at $48.06, down $5.87 from the previous day's close.  The October 14 announcement, among other things, reported that Bank of America had written off $372 million of loans totaling $1.4 billion made in connection with BankAmerica's relationship with D.E. Shaw

3

& Co. ("Shaw"), and that Bank of America had restructured the relationship with Shaw and would purchase Shaw's fixed-income securities portfolio.  BankAmerica had entered its relationship with Shaw in March, 1997, in connection with a strategic alliance relating to the structuring and marketing of equity derivatives.  BankAmerica had publicly announced the Shaw relationship on March 13, 1997, but did not disclose certain facts relating to the capitalization and related risks of the alliance from BankAmerica's standpoint.  On October 20, 1998, Bank of America announced the resignation of defendant David A. Coulter.

Commencing on or about October 15, 1998, a number of purported class actions were commenced in several United States District Courts and in the Superior Court of the State of California.  The California actions included Giorgetti v. BankAmerica Corp., case no. 998949, Desmond v. BankAmerica Corp., case no. 998629 (consolidating five California state court actions) and Deichler v. BankAmerica Corp., case no. 998673.  The actions named as defendants Bank of America and certain present and former officers and directors of Bank of America, NationsBank and BankAmerica.  The actions alleged that defendants had violated federal and California state securities laws by making misrepresentations and omissions relating to Shaw and BankAmerica's relationship with Shaw, and that defendants had misrepresented the merger as a "merger of equals" whereas it was actually a "takeover" of BankAmerica by NationsBank.

On February 11, 1999, the Judicial Panel on Multidistrict Litigation transferred the federal actions to the United States District Court for the Eastern District of Missouri for

4

consolidated pre-trial proceedings (the "Consolidated Class Actions"). On April 9, 1999, certain plaintiffs in the Consolidated Class Actions filed a Consolidated and Amended Class Action Complaint (which subsequently was amended) alleging, among other things, misrepresentations relating to Shaw and to the post-merger control of Bank of America.

One of the transferred federal actions, Rothstein v. BankAmerica Corp., No. 98-Civ-7547 (S.D.N.Y.), was filed simultaneously by Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") with the five California class actions which are now consolidated as the Desmond action. When it became clear that Milberg Weiss's clients lacked the financial stake to become lead plaintiffs in the federal case, and thereby select Milberg Weiss as lead counsel, Milberg Weiss asked leave of this Court to dismiss the Rothstein case, presumably to focus on the California cases. The federal plaintiffs and defendants herein objected to the dismissal on the grounds that the state proceedings would conflict with the federal proceedings at some indefinite point in the future. On July 1, 1999, this Court allowed Milberg Weiss to dismiss its federal case. Problems then arose which caused the Court, on April 25, 2000, to enjoin the plaintiffs and their lawyers in the Desmond California action from proceeding further. This injunction was affirmed by Eighth Circuit, and the United States Supreme Court declined to review the Eighth Circuit's decision.

On July 6, 1999, the Court certified the Consolidated Class Actions on behalf of four plaintiff classes: (1) the NationsBank Holder Class, consisting of all common and preferred shareholders of NationsBank who were entitled to vote on the merger or who held

5

their shares in NationsBank as of the close of business on September 30, 1998; (2) the NationsBank Purchaser class, consisting of all purchasers of NationsBank securities between August 4, 1998 and September 30, 1998 (together, the "NationsBank classes,"); (3) the BankAmerica Holder Class, consisting of all common and preferred shareholders of BankAmerica who were entitled to vote on the merger or who held their shares in BankAmerica as of the close of business on September 30, 1998; and (4) the BankAmerica Purchaser Class, consisting of all purchasers of BankAmerica securities between August 4, 1998 and September 30, 1998, and all purchasers of Bank of America securities between October 1, 1998 and October 13, 1998 (together, the "BankAmerica classes").

Excluded from the plaintiff classes are: (1) defendants; (2) Bank of America, its subsidiaries and affiliates, in its own right and as successor in interest of BankAmerica and NationsBank; (3) the officers and directors of Bank of America, NationsBank and BankAmerica; (4) members of the immediate families of any defendants; (5) any entity in which defendants have a controlling interest; (6) the legal representatives, heirs, successors, predecessors in interest, affiliates or assigns of any of the defendants; and (7) persons and entities who timely and validly exercised their right to exclude themselves from the classes.

The Court appointed Joseph Hempen, John M. Koehler and David P. Oetting as the representatives of the NationsBank Holder Class; Kevin Kloster as the representative of the NationsBank Purchaser Class; Selma Kaiser and Walter E. Ryan, Jr. (and subsequently

6

Leo Giorgetti) as representatives of the BankAmerica Holder Class; and Brian Markee as the representative of the BankAmerica Purchaser Class.

To represent the NationsBank classes, the Court appointed the law firm of Green Schaaf & Jacobson, P.C. as NationsBank class lead and liaison counsel, the law firms of Chitwood & Harley and Stull, Stull & Brody as co-lead counsel, and the law firms of Entwistle & Cappucci, LLP, and Wolf Haldenstein Adler Freeman & Herz, LLP, as executive committee members. To represent the BankAmerica classes, the Court appointed the law firm of Abbey Gardy, LLP (through its predecessor Abbey, Gardy & Squitieri, LLP) as lead counsel and the law firm of Krislov & Associates, Ltd. as a member of the executive committee. On December 28, 2001, the Court ordered that the law firm of Cotchett, Pitre & Simon be added to the executive committee of BankAmerica class counsel.

On May 9, 2000, the Court approved a Notice of Pendency of Class Action (the "Pendency Notice"). The Pendency Notice was mailed to class members on June 30, 2000. The Notice advised class members that they would be bound by any judgment or settlement in this action unless they excluded themselves pursuant to procedures specified in the Pendency Notice.

On October 4, 2000, class counsel moved to amend the complaint by interlineation to add additional allegations under California law. By Order dated December 14, 2001, the Court granted the motion to amend. On November 30, 2000, the BankAmerica classes moved to amend the complaint by interlineation to add further claims under

7

California law asserted in the Giorgetti California action and to amend a previously dismissed federal claim. By Order dated December 21, 2001, the Court granted the motion to amend and approved the addition of the realleged federal claim and all claims asserted under California law in the Giorgetti California action that had not been dismissed by the California Superior Court. On December 28, 2001, the Court added plaintiff Leo Giorgetti as a class representative of the BankAmerica Holder class. On February 28, 2002, the Giorgetti California Action was dismissed with prejudice.

At the time that the parties agreed to the settlement agreement proposed herein, the Court had issued a number of rulings in this action, including: (1) the denial, in substantial part, of defendants' motion to dismiss; (2) the exclusion from evidence in plaintiffs' case in chief of a July 30, 2001 SEC Consent Order in which Bank of America was the respondent; and (3) various rulings regarding the separation and sequencing of plaintiffs' claims at the pending trials. Additionally, at the time the settlement was reached, the Court had before it numerous motions, including motions for summary judgment and motions to exclude certain evidence and proposed expert testimony at trial. The parties were aware that rulings on these motions were about to be made.

Before reaching a settlement, the parties engaged in substantial discovery, including taking more than 75 depositions of fact and expert opinion witnesses, reviewing more than 1.5 million pages of documents, and consulting with numerous experts in the fields of accounting, economics, banking regulatory compliance and valuation, nearly all of

8

whom prepared written reports. Class counsel thoroughly had analyzed the relevant state and federal laws and the facts relevant to their respective clients' claims.

In January 2002, without the Court's knowledge, class and defense counsel participated in a mediation under the direction of former United States District Court Judge Nicholas Politan.   At the conclusion of such mediation, the parties entered into a Memorandum of Understanding, and later finalized the settlement agreement currently before the Court.     On February 20, 2002, the Court conducted a hearing in which the parties discussed the Memorandum of Understanding and the proposed settlement.   The Court preliminarily approved the proposed settlement in an Order dated April 5, 2002. On May 30, 2002, the Court conducted a hearing on the fairness of the proposed settlement.

## II.    Summary of Settlement Agreement Provisions

The settlement agreement provides for a total cash settlement of $490 million, to be distributed $333.2 million to the NationsBank classes and $156.8 million to the BankAmerica classes.   A portion of the settlement fund shall cover the expenses for the administration of the settlement.   Class counsel have requested to be reimbursed for their expenses from the settlement fund and to receive 25% of the settlement fund as attorneys' fees. They also have sought an amount, not to exceed $200,000, to reimburse those plaintiffs who incurred costs and expenses directly related to class representation.[2]

---

[2]   In this Order the Court will not rule on the various applications for attorneys' fees and expenses. Rather, the Court reserves ruling on such issue until an appropriate time.

The settlement agreement itself does not specify the manner in which the settlement amounts shall be allocated among the various holder and purchaser plaintiff classes. The settlement notice, however, provides that shares of NationsBank stock sold prior to the opening of trading on October 14, 1998, will receive a recovery equal to one tenth (1/10) of the recovery for shares that class members who continued to hold their shares past October 14, 1998 will receive. Persons who sold their shares of NationsBank stock prior to the closing of the merger on September 30, 1998, will not receive any payment in the settlement.

The settlement notice further provides that: (1) shares of BankAmerica stock both purchased and sold between October 1 and 13, 1998 will be treated as one tenth (1/10) of a damaged share; (2) shares of BankAmerica stock purchased between October 1 and 13, 1998 and sold at a loss between October 14, 1998 and December 31, 1998 will be treated as two damaged shares; (3) shares of BankAmerica stock purchased between August 4, 1998 and September 30, 1998 and sold on or before September 30, 1998 shall not be eligible to participate in the distribution of the settlement proceeds; and (4) for shares of Bank of America stock purchased between October 1, 1998 and October 13, 1998, and sold at a loss between October 14, 1998 and December 31, 1998, no class member's recovery for those transactions shall exceed such class member's actual losses from those transactions.

Although stated only by omission, the settlement notice further provides that shares of Bank of America stock purchased between October 1, 1998 and October 13, 1998,

and held through December 31, 1998 shall not be treated as damaged shares for the purpose of the settlement.

**III.   Law Governing Review of Proposed Settlement Agreement**

Federal Rule of Civil Procedure 23(e) requires judicial approval of class action settlements. Fed. R. Civ. P. 23(e). In assessing whether the proposed settlement protects the interests of absent class members, the Court must determine whether the proposed settlement is fair, adequate and reasonable. Van Horn v. Trickey, 840 F.2d 604, 606 (8th Cir. 1988); In re Flight Trans. Corp. Sec. Litig., 730 F.2d 1128, 1135 (8th Cir. 1984), cert. denied, 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985). The Court must consider a number of factors in determining whether a settlement is fair, reasonable, and adequate: (1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. Van Horn, 804 F.2d at 607 (citations omitted).  The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement. Id. In evaluating the settlement, the Court:

> should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation; a presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery.

Fed. Judicial Ctr., Manual for Complex Litig. § 30.42 at 240 (3d. ed. 1997).

11

A.    **Probability of Plaintiffs' Success on the Merits and Range of Recovery**

The parties vigorously disagree about the merits of this action, and the settlement agreement expressly reflects defendants' non-admission of liability.  If the litigation were to continue, plaintiffs would face many obstacles.  This case involved a multitude of highly complex legal, accounting, banking, investment banking and finance issues.

With respect to the NationsBank classes, the following unresolved issues created great risks in going forward with the case: whether BankAmerica had a duty to disclose the Shaw-related losses prior to the time at which the disclosure of such losses ultimately was made; the extent to which the joint proxy-prospectus and other BankAmerica filings with the SEC were materially false and misleading; the extent to which defendants' allegedly materially false and misleading statements affected the market price of BankAmerica stock, if at all, during the class period; the appropriate economic and statistical models for determining the extent of such influence on market price, if any, during the relevant class periods; the extent to which the October 1998 drop in the price of Bank of America stock was caused, if at all, by the bank's announcement of $372 million Shaw-related losses; whether BankAmerica's relationship with Shaw properly should have been classified as an investment or a loan; whether the 90-day bounce-back provision of the 1995 Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(3) applied to cap the potential damages available to the NationsBank classes; the extent to which defendants

12

could deny any finding of fact in the July 30, 2001 SEC Consent Order[3] in which the SEC found that the defendant bank had violated reporting provisions of federal securities laws in failing to disclose the nature of the Shaw relationship or the risks inherent therein; whether Shaw's trading losses would have been material to NationsBank shareholders voting on the merger; and whether NationsBank officers and directors were aware of Shaw's trading losses and the associated market risk, if any, to BankAmerica prior to the merger.

With respect to the BankAmerica holder class[4], the following unresolved issues created great risks in going forward with the case: the proper interpretation of the term "merger of equals"; whether defendants' statements regarding the merger of equals were materially false; whether such statements were made with scienter; and whether BankAmerica shareholders would have received a control premium even if it was known that the merger would not be one of equals. Although the "merger of equals" claims are facially less complicated than the Shaw-related claims, the "merger of equals" claims are novel and untested and the risks of proving such claims are no less fraught with danger than the risks of proving the Shaw-related claims.

Finally, with respect to all plaintiffs, the following issues created great risks in going forward: the extent to which the Court might have granted defendants' motions for

_____

[3] The Court previously ruled that plaintiffs could not introduce the Consent Order as evidence in their case in chief.

[4] The BankAmerica purchaser class would be subject to many of the same risks as the NationsBank classes, discussed immediately above.

summary judgment; the extent to which the Court might have granted defendants' Daubert motions; the extent to which the Court might have ordered that all NationsBank and BankAmerica claims be tried together in a single trial[5]; the extent to which class members who held both NationsBank and BankAmerica stock suffered any damages, and, if so, whether these cross-shareholdings were offsetting for the purposes of calculating damages; the extent to which the NationsBank class claims stand in direct contradiction to the BankAmerica class claims so that none of the members of any class can be said to have suffered any damages; whether plaintiffs could convince a jury that they had been damaged—regardless of the PSLRA bounce-back provision—when the market price of Bank of America stock rebounded within a matter of days following its $5.87 drop; whether a jury would find that defendants were not liable because they used their best business judgment during a period of unusual and rapidly changing economic and financial conditions; and whether a jury would find defendants' arguments, evidence and witnesses more persuasive than plaintiffs' and render a defense verdict.

Although plaintiffs will recover in the proposed settlement only a percentage of the damages that they sought, the Court finds that the total settlement amount of $490 million is neither meager nor inadequate, particularly in light of the many hurdles plaintiffs would face if they chose to proceed to trial. As previously discussed, plaintiffs not only would have to prove a causal connection between defendants' alleged misdeeds and the

---

[5] The question of the alignment of the parties for trial remained under consideration at the time the proposed settlement agreement was reached.

14

$5.87 per share drop, but certain plaintiffs risked a court ruling that the PSLRA bounce-back provision capped a potential damage award and all plaintiffs risked a jury finding that the manner in which the stock actually bounced back proved that plaintiffs had not, in fact, been damaged. Early on in this litigation, the Court convened a special meeting to discuss the damages element in this case. Even after an intense day of free and open discussion with several experts, many questions remained–and remain–unanswered.

> As courts have recognized, when considering settlement agreements they:

> should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere probability of relief in the future, after protracted and expensive litigation. In this respect, "it has been held proper to take the bird in the hand instead of a prospective flock in the bush."

In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 326 (N.D. Ga. 1993) (citations omitted). Moreover, the bird in hand in this case is one of the largest settlements awarded in a securities action since the passage of the PSLRA. See Securities Class Action Clearinghouse Database maintained by Stanford Law School at http://securities.stanford.edu/.[6]

Even considering the amount of damages initially sought, the proposed settlement of $490 million represents a substantial recovery. See In re Four Seasons Sec.

---

[6] According to this database, the recovery of the NationsBank plaintiffs alone would be the third largest since the passage of the PSLRA, and the recovery of the BankAmerica plaintiffs alone would be the eighth largest. Together, the recovery of all plaintiff classes would be the second largest post-PSLRA recovery.

15

Litig., 58 F.R.D. 19, 36-37 (W.D. Okla. 1972) (approving an approximately $8 million settlement when claims likely would have exceeded $100 million); Cagan v. Anchor Sav. Bank FSB, No.Civ. 88-324, 1990 WL 73423, at *12 (E.D.N.Y. May 22, 1990) (approving a $2.3 million class action settlement when best possible theoretical recovery would have been $121 million); Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 542 (S.D. Fla. 1988), aff'd without opinion, 899 F.2d 21 (11th Cir. 1990) (approving settlement of $.20 per share on desired recovery of $3.50 per share).  Ultimately, the Court finds that given the formidable risks of trial, the plaintiffs' decision to settle for $490 million is a reasonable one:

> It represents the safer, more certain, and probably less expensive route for the [classes]. In this respect, the settlement strikes a reasonable balance between, on the one hand, the hypothetically significant but risky benefits of litigation, and on the other, the certain and immediate benefits of the class-wide relief. See Manual for Complex Litigation (3d ed.1995) § 30.42. ("In cases seeking primarily monetary relief, [the fairness review] entails a comparison of the amount of the proposed settlement with the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing.").

Grove v. Principal Mut. Life Ins. Co., 200 F.R.D. 434, 446 (S.D. Iowa 2001).

## B.    The Complexity, Expense and Likely Duration of the Litigation

This case qualifies as complex, both in establishing liability and particularly in proving causation and damages.  Despite nearly four years of litigation, many complex questions of law remain unanswered and would have to be resolved at or before trial. Preparing the jury instructions alone would have been a time-consuming and unenviable task.

16

Prior rulings of the Court have dictated that the claims of the NationsBank and BankAmerica plaintiffs would be tried separately and that liability would be tried separately from damages. The trials would be lengthy, costly and complex and would involve a veritable "battle of the experts" on the penultimate issues of causation and damages. Regardless of the outcome at trial, post-judgment appeals were likely. Accordingly, the complexity, expense and duration of litigation weigh in favor of approving the proposed settlement.

### C.    The Stage of the Proceedings

During several years of discovery, the parties have taken more than seventy-five depositions, reviewed a million and a half documents, and agreed to thousands of stipulations of fact. The Court has conducted numerous hearings on various issues of law and procedure. All parties have briefed and responded to motions for summary judgment and motions in limine. At the time of settlement, a quickly approaching trial date had been set and the parties had begun preparing responses to the Court's demanding pre-trial order.

After more than three years of hard-fought litigation, and on the eve of trial, this case certainly has reached a point at which an informed assessment of its merits and the probable future course of the litigation could be made. See In re Fed. Skywalk Cases, 97 F.R.D. 380, 389 (W.D. Mo. 1983) (after one and a half years of discovery, all parties had gained a comprehensive knowledge of the facts relating to their respective claims and defenses and each had sufficient evidence on which to base an intelligent assessment of the

17

settlement proposal). Accordingly, the stage of the proceedings weighs in favor of approving the settlement.

### D.    Defendant's ability to withstand a greater judgment

Although it appears that the defendant bank has the ability to withstand a greater financial judgment, the Court finds that, given the substantial risks and obstacles faced by the classes in proceeding to trial as discussed herein, such factor does not weigh against approving the settlement.

### E.    Opinions of Class Counsel, Class Representatives and Class Members

Counsel for the parties have become intimately familiar with the facts and legal issues involved in this case. Based on their knowledge of the case and the applicable law, as well as their experience in litigating securities claims, counsel believe the settlement is fair, reasonable and adequate. Although the Court is not bound by counsel's opinion, their opinion nevertheless is entitled to great weight. See EEOC v. McDonnell Douglas Corp., 894 F. Supp. 1329, 1335 (E.D. Mo. 1995).

With respect to class members' opinions, the Court finds it significant that fewer than ten objections were filed when the classes consisted of hundreds of thousands of eligible class members who were notified several years ago of the pendency of the class action and, more recently, of the proposed settlement. The Court takes particular note of the fact that no objections were filed by any of the "institutional investors" who comprise a large part of the plaintiff classes and who will be greatly affected by the outcome of this case.

18

Because a settlement may be approved even when a large number of class members object, see id. (citing Holden v. Burlington N., Inc., 665 F. Supp. 1398, 1422 (D. Minn. 1987), the small number of objections is not an impediment to the Court's approval of the proposed settlement in this case.

Three of the representatives of the NationsBank plaintiff classes, Messrs. Oetting, Koehler and Kloster, have filed objections to the proposed settlement. Their objections will be paid special attention and discussed at length below. The fact that some of the class representatives object to the settlement does not itself prevent final approval of the settlement. The Manual for Complex Litigation (3rd) makes it clear that class representatives do not have the unfettered ability to decide whether to settle and, if so, for how much:

> Class counsel should consult the class representatives during negotiations. The representatives' views may be important in shaping the agreement and will usually be presented at the fairness hearing; they may be entitled to special weight because the class representatives may have a better understanding of the case than most members of the class. Their objections to a settlement, moreover, may be symptomatic of strained attorney-client relations that may have affected settlement negotiations. Accordingly, opposition by class representatives to a proposed settlement needs to be taken seriously by the court, and the notice of the settlement hearing should usually indicate any terms about which the class counsel and class representatives differ.
>
> Although rejection of a proposed settlement by a class representative may lead class counsel not to present the matter to the court, a class representative cannot veto a settlement that has been presented to and approved by the court. The court

19

> should not permit representatives, in violation of their fiduciary
> responsibilities, to place their individual interests ahead of the
> class's and impede a desirable settlement on behalf of the class.
> Therefore, while the objections of a class representative must be
> considered by the court, they do not preclude a settlement that
> resolves the claims of the class, including those of the
> representatives.

Manual at § 30.44.

Similarly, courts have held that class settlement agreements do not require the assent of named plaintiffs.  See Reed v. Gen. Motors Corp., 703 F.2d 170, 174 (5th Cir. 1983) (upholding settlement approval over objections of 23 out of 27 named plaintiffs); Flinn v. FMC Corp., 528 F.2d 1169, 1174 n.19 (4th Cir. 1975) ("Appellants do not argue, nor may they under the authorities, that assent of the class plaintiffs is essential to the settlement, provided the trial court finds it fair and reasonable."); Thomas v. Christopher, 169 F.R.D. 224, 243 (D.D.C. 1996) ("Class action settlement agreements do not require the assent of named plaintiffs as a prerequisite to Court approval.").

Courts have recognized that in class actions, class representatives may become adverse to one another or to the class.  See Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 589 (3d Cir. 1999) (denying lead plaintiff's motion to disqualify class counsel for having agreed to a settlement and noting that "[i]n many class actions, one or more class representatives will object to a settlement and become adverse parties to the remaining class representatives (and the rest of the class)"; Maywalt v. Parker & Parsley Petrol Co., 155 F.R.D. 494 (S.D.N.Y. 1994), aff'd, 67 F.3d 1072, 1079 (2d. Cir. 1995) ("Class counsel's duty to the class as a

20

whole frequently diverges from the opinion of either the named plaintiffs or other objectors."). Class counsel's compelling obligation in a class action is to the group that makes up the class and class counsel must act in a way that best represents the interests of the entire class. Maywalt, 155 F.R.D. at 496. A determination of what is best for the class is not dependent on the special desires of the named plaintiffs. Id.

Finally, courts have rejected the argument that a settlement cannot be applied to certain class members or representatives because they did not authorize their attorney to settle or otherwise consent to the settlement. "Because the 'client' in a class action consists of numerous unnamed class members as well as the representatives," and because the class itself "often speaks in several voices," it "may be impossible for the class attorney to do more than act in what he believes to be the best interest of the class as a whole." Parker v. Anderson, 667 F.2d 1204, 1211-12 (5th Cir. 1982). Accordingly, courts have rejected objections involving the extent and nature of class members' involvement in the settlement process. See Anderson v. Torrington Co., 755 F. Supp. 834, 837 (N.D. Ind. 1991) (because counsel were not required to, and indeed could not, remain in constant communication with the class, certain "objections based on the extent and manner of contact between counsel and class" were not "well-taken.").

Here, counsel for the NationsBank classes reached a substantial settlement and fulfilled their obligations to promote the interests of the classes as a whole. The fact that the named plaintiffs now object to the settlement does not pose a bar to accepting its fairness.

21

## IV.    Objections

Although notice of the proposed settlement was mailed to hundreds of thousands of class members and was published in regional and national publications as well as over the internet, only ten objections were filed.  Generally, the objectors complain that: no settlement should be awarded because the lawsuit is frivolous and was filed only to benefit plaintiffs' counsel; the settlement does not provide effective relief to small shareholders; the NationsBank plaintiffs do not receive enough money as an absolute dollar figure or in comparison to the BankAmerica plaintiffs; the settlement was reached without the knowledge or consent of NationsBank class representatives; the settlement fails to comport with due process; the settlement provides no consideration to certain members of the BankAmerica classes and inadequate consideration to all BankAmerica plaintiffs; neither the named plaintiffs nor the lead counsel adequately represented the interests of the class members; and class counsel should not receive 25% of the settlement fund as attorneys' fees. The Court considers each objection in turn.  As noted above, however, the Court will reserve until a later time consideration of all objections related to attorneys' fees.

### A.    The case is frivolous and will not benefit plaintiffs

Objectors William Hall, Robert Austin and Richard Hall object on the grounds that the case is frivolous and will not benefit members of the plaintiff classes but rather will benefit only class counsel.  Having lived with the instant case for more than three years, the Court readily finds that this is not a frivolous "lawyers' case."  The Court notes that this case

22

not only survived, in large part, a motion to dismiss, but also raised many difficult questions of law and procedure. This case has been hard fought on its merits and never has presented an easy victory to the defendants. Moreover, the Court flatly rejects the contention that a $490 million recovery will not benefit the plaintiff classes.

**B.    The settlement does not provide effective relief to small shareholders**

Objector Corey Morse Conover objects on the grounds that the proposed settlement is not effective in providing any real relief to small shareholders and, like most settlements, seems to have in mind only the large shareholders and plaintiffs' attorneys. He requests that small shareholders be granted a premium on their first few hundred shares. In response to this objection, the Court finds that the settlement is fair because it treats all similarly situated shareholders identically. Although it is stating the obvious to say that class members who owned fewer shares will receive a smaller recovery, the Court concludes that this aspect of the settlement is neither unfair nor unreasonable and does not compensate the smaller shareholders inadequately.

**C.    The settlement provides inadequate compensation to the NationsBank plaintiffs**

Objectors Marlene Zafft and Carol Mackay, and the NationsBank lead plaintiffs and objectors David Oetting, Michael Koehler and Kevin Kloster, object on the grounds that the NationsBank plaintiffs are compensated inadequately by the proposed settlement not only in an absolute dollar amount but also in comparison to the BankAmerica plaintiffs. They believe that the Shaw-related claims have significantly more merit than the

23

"merger of equals" claims and that a greater percentage of the global settlement should have been allocated to the NationsBank plaintiffs.

In response to these objections, the Court first notes that the nature of any settlement is compromise. In the settlement of this case, as in any case, the defendants agreed to pay more than they would have preferred and the plaintiffs agreed to receive less than they would have preferred. As discussed above, this settlement provides significant recoveries to the NationsBank plaintiff classes, particularly in light of the risks they would have faced in proceeding to trial. Moreover, the Court does not agree with NationsBank plaintiffs that the merger of equals claims lacked settlement value. Apparently, having agreed to pay $156.8 million to the BankAmerica plaintiffs, neither did defendants.

Moreover, defendants have repeatedly and compellingly asserted that they paid both classes of plaintiffs more in the instant global settlement out of a desire to obtain "total peace" than they would have paid either group of plaintiffs individually. Class counsel, who negotiated with defendants prior to the mediation, have confirmed defendants' assertions that at no time prior to the mediation was as much money offered to either plaintiff class as ultimately was agreed upon in the proposed settlement. Despite NationsBank plaintiffs' arguments that BankAmerica plaintiffs deprived them of a portion of "their" potential recovery, the fact that BankAmerica plaintiffs were part of the global settlement <u>added significantly</u> to the total settlement offered to the NationsBank plaintiffs. It appears to the Court that the plaintiffs, collectively, "left no money on the table." Class counsel are well

24

aware of the relative strengths and weaknesses of their respective cases, and the Court finds no reason to second guess the judgment of class counsel in agreeing to allocate two-thirds of the recovery to the NationsBank plaintiffs and one-third to the BankAmerica plaintiffs.

Finally, these NationsBank objectors suggest that NationsBank class counsel were "strong-armed" by the mediator into agreeing to accept such an allegedly low dollar amount and percentage of the global settlement. The Court had no involvement in the mediation and, in fact, was unaware of the mediation until informed of its proceedings by the parties. The Court, however, has been involved as a mediator hundreds of times and is aware that mediators utilize different tactics to bring the parties to compromise. Counsel for the NationsBank plaintiffs were not bound by any suggestions that may have been made by the mediator, but instead freely chose to enter the proposed settlement agreement. Because the Court finds an allocation of $333.2 million to the NationsBank classes to be fair, reasonable and adequate, the Court will not reject the settlement based on the lead plaintiffs' perception of the mediator's tactics.

**D.      The settlement was reached without the knowledge or consent of NationsBank class representatives**

NationsBank lead plaintiffs Oetting, Koehler and Kloster object on the grounds that they have not approved the proposed settlement. Although these lead plaintiffs admittedly were present with NationsBank class counsel during the first two days of the mediation, they claim that the mediator asked them to leave at the end of the second day and not to return. In any event, lead plaintiffs were not present at the mediation when the

proposed settlement was reached. The lead plaintiffs assert that before they were asked to leave the mediation, NationsBank class counsel stated unequivocally that they would go to trial rather than accept less than $500 million for the NationsBank plaintiff classes. The objecting lead plaintiffs claim that they did not authorize, and do not approve, a settlement which provides "only" $333.2 million to the NationsBank classes. NationsBank class counsel have informed the Court that they have different recollections both of the mediator's statements regarding the presence of the lead plaintiffs at the mediation, as well as of their own statements regarding the value of their claims.

As discussed in detail in section III(E) above, courts may find class action settlements to be fair, adequate and reasonable despite the objection of lead plaintiffs. Class counsel's overriding duty is to the plaintiff class, and their objective is to act in the best interests of the class as a whole. In securing such a large settlement for the NationsBank plaintiffs in the face of the great risks in proceeding to trial, the Court finds that NationsBank class counsel succeeded in their duty and met their objective in agreeing to the proposed settlement agreement.

Despite NationsBank lead plaintiffs' complaints that they were shut out of the mediation before the moment of settlement, the Court finds that they actually had a significant degree of involvement in the mediation process. The Court does not doubt that NationsBank class counsel would have preferred to "take home" a greater settlement amount than $333.2 million, and may have made statements to that effect amongst themselves during

26

the mediation proceedings.  Because the Court ultimately finds a NationsBank plaintiff recovery of $333.2 million to be fair, adequate and reasonable, however, the Court will not entertain a "he said, she said" argument about the nature of, or inferences to be drawn from, such comments.  Similarly, the Court will not stand in judgment of the mediator's decision to conduct a portion of the mediation with NationsBank class counsel alone[7].

**E.     The settlement fails to comport with due process because large portions of the record remain under seal and class notice is deficient**

BankAmerica class members Ernesto Gumapas, Sidney Sorkin and Herman Shyken, and objector Alison Desmond, a former class member who has opted out of this litigation (the "Desmond objectors"), object on the grounds that the settlement fails to comport with due process because large portions of the record remain under seal and the notice to class members allegedly is deficient.  The Court first addresses the objection regarding the sealed records.

**1.     Sealed documents**

During the course of this litigation, the parties have filed many documents under seal pursuant to the protective order entered in this case.  Despite objecting to the number of documents filed under seal, the Desmond objectors have conceded that, pursuant

_____

[7] In support of their objection, the NationsBank lead plaintiffs have presented a declaration of Professor Geoffrey Hazard which makes certain conclusions about the mediation and proposed settlement based "upon the recitation of facts described to me by Mr. Oetting." Hazard Decl. at 1.  Having considered Professor Hazard's declaration, the Court ultimately concludes that Professor Hazard, like the Court, was not present at the mediation and thus is in no position to judge the conduct of the mediator based on the "he said" of one of the mediation's participants.

to Federal Rule of Civil Procedure 26(c), the sealing of documents pursuant to a protective order may be appropriate. Moreover, the Desmond objectors have pointed to no authority suggesting that a settlement fails to comport with due process when the record includes documents filed under seal pursuant to a protective order. Finally, the Desmond objectors suggested that their concerns regarding the sealed records "may be addressed by requiring Objectors and their counsel to adhere to the terms of the Protective Order that has been entered in this case." See Doc. 473 at 5 n.1.

After consultation with the parties, the Court ordered that all objectors of record who sought to review sealed documents be given full access to such documents, provided that they agreed to be bound by the terms of the protective order. See Order of May 23, 2002 (Doc. 509). Immediately thereafter, counsel for the Desmond objectors agreed to be bound by the protective order and began extensively reviewing and copying filings made under seal. See Order of May 28, 2002 (Doc. 515). The Court thus concludes that due process has been provided with respect to access to the Court's records.

### 2.    Contents of class notice

The Desmond objectors next argue that the notice of settlement published to class members failed to comport with due process because it did not sufficiently notify class members that the California state law claims were being settled along with the federal claims in this case. As will be discussed below, the premise of this objection is that the California claims would have been much more lucrative than the federal claims, and that class members

28

should have been specially alerted that they were giving up such lucrative claims as a part of the global settlement.

It is well settled in this Circuit that "[class] notice is not required to provide a complete source of information." Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1153 (8th Cir. 1999). "Notice of a settlement proposal need only be as directed by the district court." DeBoer v. Mellon Mortgage Co., 64 F.3d 1171, 1176 (8th Cir. 1995). In Petrovic, the Eighth Circuit rejected allegations that a notice to class members of a proposed settlement did not comport with due process because, while it stated the maximum aggregate amount that defendant would pay to the plaintiff class as a whole, it did not specify how such aggregate amount would be allocated. Petrovic, 200 F.3d at 1152. The Eighth Circuit stated:

> Under Fed.R.Civ.P. 23(e), the district court directs the form of the notice of settlement, and the notice need only satisfy the "broad 'reasonableness' standards imposed by due process." Grunin, 513 F.2d at 121. The Supreme Court has found that the notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The notice in this case unquestionably alerted the recipients that they were members of a pending class action, that a settlement had been proposed, and that they had the right to state their objections at a fairness hearing.
>
> We recognize that the information provided to the class members in the notice must be structured "in a manner that enables class members rationally to decide whether they should intervene in the settlement proceedings or otherwise make their views known." Reynolds v. National Football League, 584 F.2d 280, 285 (8th Cir.1978). Under Reynolds, 584 F.2d at 285, the

29

> notice of settlement must be sufficiently detailed to permit class members to determine the potential costs and benefits involved, or at least whether additional investigation into the matter would be an efficient use of their time. This standard has been met here. The notice described with sufficient particularity the stakes involved: the settlement of environmental claims against Amoco, the award of significant injunctive relief, and the potential aggregate payout of over seven million dollars in compensatory damages.

Petrovic, 200 F.3d at 1152-53.  As found acceptable in Petrovic, "[t]he notice in this case unquestionably alerted the recipients that they were members of a pending class action, that a settlement had been proposed, and that they had the right to state their objections at a fairness hearing."  Id. at 1153.

More importantly, the Court finds that the class notice did in fact inform class members that they would be releasing their California claims by participating in the settlement.  Page four of the class notice informed class members that, since the sending of the notice of pendency, "[t]he Consolidated Amended Complaint was further amended to include claims against defendants based on California state law" which "substantially overlapped" the claims brought in the Desmond and Giorgetti California actions. See Notice of Proposed Class Settlement at 4.  Page seven of the class notice informed class members that, in consideration for their payment to the classes, defendants would be released "from all claims that were asserted, or which could have been asserted, in the consolidated actions, and all claims of the class members, whether direct, class, or derivative, arising out of the Merger or from the bank's relationship with D.E. Shaw." See id. at 7.  Read together, the

30

notice provisions make clear that class members are releasing their California claims as part of the settlement agreement.  No more detail is required under the law in this Circuit. Petrovic, 200 F.3d at 1152-53.  Accordingly, the Court finds that the notice comported with requirements of due process.

### 3.      Timing of class notice

Notice to class members of the proposed settlement was mailed between April 15 and April 22, 2002.  The notice informed class members that the last date for objections would be May 13, 2002 and the fairness hearing would be May 30, 2002.  The Desmond objectors claim that the class notice failed to comport with due process because it failed to provide adequate time for the class members to decide whether to object and be heard.

The Court finds that the timing of the class notice comported with due process. There were three to four weeks between the mailing of class notice and the last date to object, with an additional three weeks to prepare for the settlement hearing.  This provided enough time for class members adequately to present their objections.  See Grunin v. Int'l House of Pancakes, 513 F.2d 114, 120-121 (8th Cir. 1975) (nineteen days notice was enough time to object, particularly when case had been ongoing for two years); Miller v. Republic Nat'l Life Ins. Co., 559 F.2d 426, 430 (5th Cir. 1977) (in securities fraud class action case, a period of "almost four weeks between the mailing of the notices and the settlement hearing" was adequate time, particularly when only one class member objected to the timing and where such class member was a part of the case since its inception); United Founders Life Ins. Co.

31

v. Consumers Nat'l Life Ins. Co., 447 F.2d 647, 652 (7th Cir. 1971) (in securities class action, adequate timing was provided when notice was mailed on May 28 and fairness hearing was held on June 22); Air Lines Stewards & Stewardesses Assoc. v. Am. Airlines, Inc., 455 F.2d 101, 108 (7th Cir. 1972) (in gender discrimination class action, class members were afforded a "reasonable time" of 30 days between sending of the notice and the hearing).

**F.      the settlement provides inadequate consideration to all BankAmerica plaintiffs, and particularly the BankAmerica purchasers**

      **1.      All BankAmerica plaintiffs are inadequately compensated because the settlement does not provide a separate recovery for their California claims**

The Desmond objectors complain that BankAmerica plaintiffs will not be adequately compensated by means of the proposed settlement. In general, the Desmond objectors argue that a settlement which provides at most $.22 per share to most BankAmerica plaintiffs is grossly inadequate when class members could have recovered $5.87 per share under California law. In support of their objection, the Desmond objectors have submitted an affidavit by Bjorn Steinholt with respect to damages. Mr. Steinholt submits an analysis of potential recoveries in which he employs a "simplifying assumption" that the entire $5.87 per share stock price drop is potentially recoverable as damages. See Doc. 471.

As discussed above, a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate. Moreover, a "simplifying" assumption that the entire stock drop—which lasted for only a few days—would be recoverable as damages ignores each

Jul-08-02   03:45pm   From-JOHN F NANGLE USDJ            8126590401T            T-322   P 034/048   F-816

and every risk of proceeding to trial as described in Section III(A) above. While the Desmond objectors are correct in arguing that the damages potentially available under California state law would not be capped according to the PSLRA's bounce back provision, they fully ignore other factors that well might limit the potential recovery on the California claims.

The California claims are brought under §§ 24400 and 25500 of the California Corporate Code. California courts applying such provisions recently have held that only persons who <u>willfully</u>, and not merely recklessly, violate such provisions may be liable for damages. <u>Ca. Amplifier, Inc. v. RLI Ins. Co.</u>, 94 Cal. App. 4th, 102, 112-13 (Ca. App. 2001) (discussing other cases reaching the same conclusion). Stated another way, liability is limited to "situations where there is an intent to defraud through a knowingly false statement." <u>Id</u>. at 112. This is a particularly high hurdle.

Additionally, plaintiffs still must prove causation under California law. Under the California Corporate Code:

> Any person who willfully participates in any act or transaction in violation of Section 25400 shall be liable to any other person who purchases or sells any security at a price which was affected by such act or transaction for the damages sustained by the latter <u>as a result of</u> such act or transaction. Such damages shall be the difference between the price at which such other person purchased or sold securities and the market value which such securities would have had at the time of his purchase or sale in the absence of such act or transaction, plus interest at the legal rate."

Cal. Corp. Code § 25500. To collect damages of $5.87 per share under California law,

plaintiffs would have to prove that the entire alleged inflation of the bank's stock was caused by defendants' willfully fraudulent conduct. Under California law, as under federal securities laws, a plaintiff recovery is anything but certain. A recovery of $5.87 per share flirts with fantasy. The Desmond objectors' assumption of a $5.87 per share recovery ignores the fact that "[m]athematical computation of a prospective recovery is impossible in any lawsuit and especially difficult in stockholders' suits, which are notoriously unpredictable and uncertain." 2 H. Newberg and A. Conte, Newberg on Class Actions, §11.44 at 11-99 (3d ed.1992). The Court therefore rejects the Desmond objectors' argument that a $156.8 million settlement for the BankAmerica plaintiffs is somehow inadequate due to the existence of the California claims.

> **2.    The allocation of the BankAmerica settlement fund to the members of the BankAmerica purchaser class is not fair, reasonable or adequate**
>
> **a.    Pre-October 1, 1998 BankAmerica purchasers**

The Desmond objectors challenge the settlement on the grounds that the percentage of the settlement allocated to the BankAmerica purchaser class is particularly inadequate. First, the Desmond objectors argue that the settlement "extinguishes" for no consideration the claims of all plaintiffs who purchased BankAmerica stock between August 4, 1998 and September 30, 1998. See Objections to Proposed Class Settlement Submitted by Ernesto Gumapas, Sidney Sorkin, Herman Shyken and Alison Desmond at 1. This objection patently misconstrues the terms of the proposed plan of allocation. The Class

Notice provides that "[e]ach share of BankAmerica common stock, <u>purchased at any time,</u> and owned as of the close of business on September 30, 1998, equals one damaged share." Notice of Proposed Class Action Settlement at 10 (emphasis added).  The only limitation on the recovery of investors who purchased BankAmerica stock between August 4, 1998 and September 30, 1998, is that such investors may not share in the recovery if they sold their shares on or before September 30, 1998–i.e. the date of the merger.  <u>See id</u>.  Thus, under the proposed plan of allocation, all BankAmerica purchasers who bought their shares between August 4, 1998, and September 30, 1998, and held their shares through the consummation of the merger shall receive a $.22 per share recovery.  The Court finds no unfairness here.

### b.   October 1-13, 1998 Bank of America Purchasers

The Desmond objectors next challenge the settlement on the grounds that class members who purchased Bank of America stock between October 1, 1998 and October 13, 1998 (the "October purchasers") and who held their shares through the end of 1998 are provided no consideration in the settlement.  The Court first notes that this observation is correct.  Under the proposed plan of allocation, each share of Bank of America common stock purchased between October 1 and 13, 1998 and sold during the same period is treated as one tenth (1/10) of a damaged share, each share purchased between October 1 and 13 and sold at a loss between October 14 and December 31, 1998 is treated as two damaged shares, and each share purchased between October 1 and 13 and held through the end of 1998 will not share in the settlement recovery.  <u>See</u> Class Notice at 10.  The Desmond objectors rely

35

on Grunin v. Internat'l House of Pancakes, 513 F.2d 114 (8th Cir. 1975) and Reynolds v.

Beneficial Nat'l Bank, 288 F.3d 277 (7th Cir. 2002) in support of their argument that such

allocation is not fair, reasonable or adequate.

        Counsel for the BankAmerica plaintiffs respond that because all BankAmerica

purchasers "seek damages for their purchase of the bank's common stock at an artificially

inflated price," counsel determined that it would be "fair, adequate and reasonable to allocate

settlement funds for those claims only to those who suffered an actual economic loss"–i.e.

who "did not sell their shares at a profit or held them after the class period at market prices

higher than their purchase price." BankAmerica Pls.' Answers to Ct.'s Questions (Doc. 546)

at 1. Counsel refer to this as a "rescissory type theory of recovery" and concede that such

theory "differs from the out-of-pocket measure of damages advanced prior to settlement by

the Purchaser Class's damage expert." Id. Counsel claim that, in In re Mego Fin. Corp. Sec.

Litig., 213 F.3d 454, 460-61 (9th Cir. 2000), the Ninth Circuit recently approved a similar

plan of allocation over similar objections.

        Counsel then note that the members of the purchaser class who purchased their

stock between August 4 and September 30, 1998 (the "pre-October purchasers") assert the

same claims as the members of the BankAmerica holder class–proxy claims under Section

14(a) of the Exchange Act and Rule 14a-9, and claims for breach of fiduciary duty under

Delaware law–while the October purchasers do not. "Because the [pre-October purchasers]

have asserted these additional holder claims, we feel it is appropriate to allocate a share of

the settlement fund to each purchaser class member who bought from August 4, 1998 through September 30, 1998, regardless of when or at what price such shares were sold." BankAmerica Pls.' Answers to Ct.'s Questions at 3.

Counsel then conclude that the $.22 per share allocation to the pre-October purchasers is "not unfair to the [October] purchaser who suffered no economic loss. It merely recognizes that [pre-October] purchasers asserted multiple claims for relief, that they asserted claims as to which damages were unrelated to the purchase price of the shares at issue, and that, therefore" they should recover pursuant to the settlement "regardless of whether they sold their shares at a profit." Id. at 3-4.

Despite their decision to allocate no portion of the proposed $156.8 million settlement to many October purchasers, counsel continue to maintain that the October purchasers have stronger claims than the pre-October purchasers. To support this contention, counsel point out that defendants' argument that they had no duty to disclose a pre-September 30, intra-quarter D.E. Shaw trading loss is stronger than their argument that they had no duty to disclose such trading losses after September 30, when "soft" information had become "hard" information regarding fixed trading losses. Id. at 6. Additionally, only the October purchasers could have relied on Hugh McColl's October 1, 1998 public statements that the bank had "below $300 million" in total lines of credit outstanding to hedge funds, and that all of the bank's loans to hedge funds were secured. Id.

37

In considering the instant objection, the Court first notes that the authority presented on both sides is unpersuasive. Reynolds appears to be a lawyer-driven case in which the Seventh Circuit perceived the lawyers to "place their pecuniary self-interest ahead of the class" in "derogation of their professional and fiduciary obligations." See Reynolds, 288 F.3d at 279. Because the instant case is not a lawyer-driven case, and the Court finds that class counsel have not derogated their professional and fiduciary obligations to the classes at any time, the Court finds Reynolds to be inapposite. Similarly, Grunin does not support the Desmond objectors' argument because it concerned a proposed settlement which would have barred plaintiffs from seeking further relief while allowing defendant to continue its allegedly illegal activities. Grunin, 513 F.2d at 119.[8] In the instant case, there has been no allegation of a continuing violation of the securities or other laws.

Finally, the Court finds Mego to be unhelpful for several reasons. First, in Mego, there was only one plaintiff class. Mego, 213 F.3d at 461. Thus, although the Mego settlement left a majority of plaintiffs with no recovery, it applied a strictly rescissory theory of damages to all plaintiffs. This is quite unlike the case at bar, in which a purely rescissory theory–under which plaintiffs who sell at no loss take no recovery–is applied only to the October purchasers, a portion of one of several plaintiff classes. Counsel for BankAmerica plaintiffs specifically state that the $.22 per share recovery for the pre-October purchasers

---

[8] In Grunin, an initial settlement was proposed and then rejected, and a second settlement later was proposed and approved. Because the Desmond objectors refer to the initial, rejected, settlement, it is this initial settlement to which the Court refers. Grunin, 513 F.2d at 114.

shall include compensation for <u>both</u> their holder and purchaser claims, in contrast to the holders (who are not also members of the purchaser class) whose \$.22 per share recovery shall cover <u>only</u> their holder claims. <u>See</u> BankAmerica Pls.' Answers to Ct.'s Questions at 3 n.4. Accordingly, because the pre-October purchasers will recover something <u>for their purchaser claims</u> regardless of when they sold their stock, it cannot be correct that a purely-rescissory theory is applied to their purchaser claims. Therefore, it is only the October purchasers who are subject to a truly rescissory theory of damages in the proposed plan of allocation.

Second, it appears that, in <u>Mego</u>, the rescissory theory of damages was the first, and only, theory of damages propounded on behalf of the class. This is quite different from the case at bar in which BankAmerica plaintiffs' expert Alan Wetzel earlier presented a non-rescissory theory of damages for all BankAmerica purchasers.[9] Third, although the <u>Mego</u> court looked to the PSLRA for guidance, the PSLRA did not govern in <u>Mego</u>, but does govern the October purchasers' 10(b) and Rule 10b-5 claims. <u>See Mego</u>, 213 F.3d at 461 n.3 ("The PSLRA does not govern this class action but it is instructive."). Because <u>Mego</u> is so readily distinguishable in such material respects, the Court finds that the fairness of the proposed plan of allocation cannot rest on its authority.

---

[9] <u>See</u> BankAmerica Pls.' Answer to Ct.'s Questions at 1 ("This proposed rescissory type theory of allocation differs from the out-of-pocket measure of damages advanced prior to settlement by the Purchaser Class's damage expert.").

Finding the authority presented both by the Desmond objectors and the BankAmerica plaintiffs to be unpersuasive, the Court nevertheless must determine whether the proposed plan of allocation fairly, reasonably and adequately compensates the October purchasers for their claims. Ultimately, the Court concludes that it does not, particularly given the history of this case and the amount of settlement offered.

For the past three and a half years, the BankAmerica plaintiffs have strenuously argued, both on brief and through expert testimony, that ALL members of the purchaser class were injured and entitled to damages. Other than conceding that the October purchasers' 10(b) and Rule 10b-5 claims are subject to the PSLRA's ninety day bounce-back provision while arguing that the pre-October purchasers' claims are not,[10] the BankAmerica plaintiffs did not, prior to settlement, distinguish between the strength of the claims of, or the damages available to, the pre-October purchasers and the October purchasers. When the

---

[10] At the time of settlement, the Court had not yet ruled upon whether the PSLRA 90-day bounce back provision applied to the purchase of Old BankAmerica or NationsBank stock. Under the bounce-back, a purchaser's damages are limited as follows. "(1) In general: Except as provided in paragraph (2), in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market. (2) Exception: In any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, if the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1), the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security." 15 U.S.C. §§78u-4(e)(1) and (2).

BankAmerica plaintiffs did ultimately distinguish between the strength of the purchasers'
claims, they contended that the claims of the October purchasers were stronger. See
BankAmerica Pls.' Answers to Ct.'s Questions at 6-8. Given the admitted strength of the
October purchasers' claims, the plan of allocation, which offers no recovery to any October
purchaser who held her stock through the end of December, 1998, appears to compensate
many October purchasers unfairly, unreasonably and inadequately.

If the October purchasers' 10(b) and Rule 10b-5 claims were their only claims,
the Court could find fair a plan of allocation which subjected the October purchasers to the
PSLRA's bounce-back provision. In this case, however, it is not the 90-day mean trading
price but rather the seemingly arbitrary date of December 31, 1998 which is used to limit, and
in many cases to preclude, the October purchasers' recovery. Moreover, the 10(b) and 10b-5
claims are not the October purchasers' only claims. The October purchasers, like all
plaintiffs in this case, bring claims under the California Corporate Code which are not subject
to the PSLRA's bounce-back provision. It is self-evident that the BankAmerica plaintiffs
would not have brought these California claims unless they perceived such claims to have
some value. It seems fundamentally unfair that all plaintiffs should receive value for their
California claims (as a portion of their settlement recovery) except for the October purchasers
who held their stock past December 31, 1998.

Finally, this is not a case in which defendants are not offering enough money
to go around. Defendants have offered a total of $156.8 million to the BankAmerica

41

plaintiffs.  The Court is certain that a portion of this money could be used to fairly, reasonably and adequately compensate all BankAmerica plaintiffs, including all October purchasers, for their claims.

The Court finds that to be fair, reasonable and adequate, any proposed allocation to the October purchasers must reflect both the strength of their claims under California law–which are not subject to the PSLRA bounce-back provision–and the strength of their 10(b) and 10b-5 claims, which are subject to the bounce-back.  Additionally, the plan of allocation should reflect the strength of all of the October purchasers' claims as compared to the strength of all of the claims of other plaintiffs.  While it is possible that such a calculus may result in a recovery of less than a full "damaged share" for each share of Bank of America stock purchased between October 1 and 13, 1998, it is inconceivable, with $156.8 million on the table, that such calculus fairly could result in no recovery at all.

Because the Court may not refashion the plan of allocation, but rather may only accept or reject the settlement as presented, see  In re Flight Transp. Corp. Sec. Litig., 794 F.2d 318, 321 (8th Cir. 1986) ("the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed"), the Court does not articulate an alternative plan of allocation herein, but rather calls upon counsel, if they so desire, to reformulate a plan of allocation applying these principles.

Defendants, citing the settlement agreement, have suggested that the Court can approve the settlement while disapproving the plan of allocation. See Defts.' Statement Supp. Settlement (Doc. 505) at 2. Defendants, however, have not presented, and the Court is not aware of, any authority which would allow the Court to take such an action. Although the plan of allocation is set forth in a separate document, the Court perceives it to be part and parcel of the proposed settlement agreement. One must rise, or fall, with the other. Therefore, because the Court cannot approve the plan of allocation with respect to the BankAmerica October purchasers, it must reject the proposed settlement as well as the proposed plan of allocation.

## G.   Neither the named plaintiffs nor the lead counsel adequately represented the interests of the class members

The Desmond objectors challenge the settlement on the grounds that neither the named plaintiffs nor the lead counsel adequately represented the interests of the plaintiff class members. In addition to their objection on this ground, the Desmond objectors have moved the Court to appoint new counsel for the plaintiff classes. See Doc. 506. The Court has a duty "to ensure that class representation is adequate and proper at all times during a class action." Briggs v. Anderson, 796 F.2d 1009, 1017 (8th Cir. 1986). As mentioned earlier in this Order, the Court has lived with this case for many years and, in doing so, has had many occasions on which to judge the representation by lead counsel of their client classes. Lead counsel have conducted themselves professionally and have adequately and zealously represented the interests of their clients. The Court finds this to be true even

43

though the Court ultimately must reject the settlement because of the proposed allocation to the October purchasers. The Desmond objectors' motion to appoint new counsel (Doc. 506) is therefore DENIED.

The Desmond objectors contend that the settlement should be rejected on the grounds that NationsBank plaintiffs' counsel have given "inadequate attention and value" to their clients' California claims. As the Court discussed in Section IV(F)(1) above, it finds the Desmond objectors' view regarding the value of the California claims to be greatly inflated. Because the Court finds that counsel for the NationsBank plaintiffs have zealously represented their clients' interests, and that the proposed settlement reasonably, fairly and adequately compensates the NationsBank plaintiffs for all of their claims, it will not appoint new counsel or reject the settlement on this ground.

The Desmond objectors claim that the settlement should be rejected because an alleged "conflict" between the BankAmerica purchaser and holder classes has led BankAmerica plaintiffs' counsel to abandon the interests of the BankAmerica purchaser class. As discussed above, the Court is rejecting the settlement because of its allocation of the settlement proceeds among the BankAmerica plaintiffs. The Court, however, has seen counsel litigate vigorously and consistently on behalf of the interests of all members of the BankAmerica purchaser class. Having studied BankAmerica counsel's explanation for their proposed allocation, the Court finds that it is neither devoid of an internal logic nor intentionally hostile, as the Desmond objectors suggest, to the BankAmerica purchasers. The

44

Court perceives that, as they have done throughout the course of this litigation, BankAmerica plaintiffs' counsel set out to fairly compensate all members of their plaintiff classes but, for the reasons articulated above, fell short in one respect in the Court's estimation. Ultimately, the Court finds that the Desmond objectors have not presented evidence of a conflict which would provide independent grounds on which to reject the proposed settlement.

Finally, the Desmond objectors claim that the settlement should be rejected because named plaintiffs have failed to represent the interest of the class members with respect to the California claims and have concealed from the Court alleged personal and professional conflicts of interest. As discussed above, the Court will not reject the proposed settlement due to the Desmond objectors' theoretical, at best, valuation of the California state law claims. With respect to the allegation regarding "conflicts," the Desmond objectors complain generally that named plaintiffs Kevin Kloster and Joseph Hempen were not familiar enough with this case, that named plaintiff David Oetting may have been too familiar with plaintiff and defense counsel, and that class representative Robert Hepworth's ability to represent the NationsBank plaintiffs previously has been called into question (and resolved in Mr. Hepworth's favor). The Court finds such complaints to be unpersuasive and remains satisfied that Messrs. Oetting, Kloster, Hempen and Hepworth have fairly, and properly, worked for the interests of the NationsBank classes as required by Fed. R. Civ. P. 23(a)(4) and the PSLRA.

45

## V.    Conclusion

The issue before the Court is whether the proposed settlement agreement and plan of allocation are fair, reasonable and adequate. Having carefully considered each of the written objections as well as the comments made during the fairness hearing, and having given great weight to the opinion of counsel, see EEOC v. McDonnell Douglas Corp., 894 F. Supp. 1329, 1335 (E.D. Mo. 1995), the Court has determined as follows. A $490 million global settlement which provides $333.2 million to the NationsBank classes and $156.8 million to the BankAmerica classes is fair, reasonable, and adequate when considering: the probability of plaintiffs' success on the merits; the range of recovery; the complexity, expense and likely duration of the litigation; the stage of proceedings; defendants' ability to withstand a greater judgment; and the opinions of class counsel, class representatives and class members. The proposed plan of allocation is fair, reasonable and adequate with respect to all NationsBank plaintiffs, the BankAmerica holder plaintiffs and pre-October BankAmerica purchaser plaintiffs. Because, however, the plan of allocation is unfair, unreasonable and inadequate with respect to the October purchasers who held their shares through December 31, 1998, the Court hereby DENIES the instant motion to approve the proposed settlement agreement (Doc. 485) and its plan of allocation for the reasons stated herein. As discussed above, the Court also DENIES the Desmond objectors' motion to appoint new counsel (Doc. 506).

The Court strongly believes and anticipates that the proposed settlement may be salvaged through the submission of a revised plan of allocation consistent with the principles of fairness articulated in this Order. The Court therefore invites counsel for the parties to submit, in an expeditious manner, such revised plan of allocation for the Court's consideration.

So ORDERED.

DATE: JULY 8, 2002

UNITED STATES DISTRICT COURT

47

UNITED STATES DISTRICT COURT - EASTERN MISSOURI
INTERNAL RECORD KEEPING

**** CONSOLIDATED CASE ****

AN ORDER, JUDGMENT OR ENDORSEMENT WAS SCANNED, FAXED AND/OR MAILED TO THE
FOLLOWING INDIVIDUALS ON 07/09/02 by dbraun
                    4:99md1264     BankAmerica Corp vs

15:77 Securities Fraud

```
Arthur Abbey -                      Fax: 212-684-5191
Robert Abrams -                     Fax: 212-686-0114
Mark Anderson -                     Fax: 415-861-3151
Jonathan Andres -   73763           Fax: 314-862-1606
Richard Appleby -                   Fax: 212-809-6274
Robert Berg -                       Fax: 201-461-9598
Daniel Berger -                     Fax: 212-554-1444
Neal Berinhout -                    Fax: 404-876-4476
Jeffrey Block -                     Fax: 617-542-1194
Aaron Brody -                       Fax: 212-490-2022
Jules Brody -                       Fax: 212-490-2022
Tzivia Brody -                      Fax: 212-490-2022
Lisa Buckser -                      Fax: 212-554-1444
Vincent Cappucci -                  Fax: 212-894-7272
Martin Chitwood -                   Fax: 404-876-4476
John Clear -   2828                 Fax: 314-259-2020
Donald Clooney -   2830             Fax: 314-231-6909
Thad Davis -                        Fax: 212-403-2000
Richard Donaldson -                 Fax: 302-622-7100
Marc Edelson -                      Fax: 215-230-8735
Jay Eisenhofer -                    Fax: 302-622-7100
Andrew Entwistle -                  Fax: 212-894-7272
Mark Epstein -                      Fax: 213-687-3702
Robert Finkel -                     Fax: 212-486-2093
Burton Finkelstein -                Fax: 202-337-8090
Marvin Frank -                      Fax: 212-682-1892
Andrew Friedman -                   Fax: 202-408-4699
Robert Frutkin -                    Fax: 215-923-9353
David Fry -                         Fax: 415-512-4077
Mark Gardy -                        Fax: 212-684-5191


Melvin Goldman -
MORRISON AND FOERSTER LLP
425 Market Street
San Francisco, CA  94105 - 2482

Mark Grady -                        Fax: 212-684-5191
John Grant -                        Fax: 415-288-4534
Stuart Grant -                      Fax: 302-622-7100
Martin Green -   3265               Fax: 314-862-1606
Harvey Greenfield -                 Fax: 212-949-0049
Bernard Gross -                     Fax: 215-561-3000
Deborah Gross -                     Fax: 215-561-3000
Marc Gross -                        Fax: 212-661-8665
Peter Harrar -                      Fax: 212-686-0114
D. Hufford -                        Fax: 212-661-8665
Joe Jacobson -   3471               Fax: 314-862-1606
David Jaroslawicz -                 Fax: 212-732-6746
Michael Karnuth -                   Fax: 312-606-0207
Reed Kathrein -                     Fax: 415-288-4534
Shannon Keniry -                    Fax: 202-337-8090
Jeffrey Kessinger -   67972         Fax: 208-474-9379
Jeffrey Konis -                     Fax: 404-876-4476
Daniel Krasner -                    Fax: 212-545-4653
Clinton Krislov -                   Fax: 312-606-0207
```

```
Nicole J. Zavales -       Fax: 314-613-2550
William Lerach -          Fax: 619-231-7423
Mark Levison -   5560     Fax: 314-613-2550
Lester Levy -             Fax: 212-486-2093
Mel Lifshitz -            Fax: 201-461-9598
Mitchell Margo -   3742   Fax: 314-725-8789
Michael Matraia -         Fax: 617-542-1194
Robert Mazur -            Fax: 212-403-1000
Joseph McBride -          Fax: 212-682-1892
Brian McGovern -   3804   Fax: 636-532-0857
Christi Mobley -          Fax: 404-876-4476
Jonathan Moses -          Fax: 212-403-2000
Klari Neuwelt -           Fax: 212-593-9131
Edward Nicholson -        Fax: 404-876-4476
Jeffrey Nobel -           Fax: 860-493-6290
James Notis -             Fax: 212-684-5191
Stephen Oestreich -       Fax: 212-486-2093
Andrew Ogilvie -          Fax: 415-861-3151
Ronald Olson -            Fax: 213-687-3702
Jonathan Plasse -         Fax: 212-818-0477
Barbara Podell -          Fax: 215-923-9353
Michael Pucillo -         Fax: 561-835-0322
Darryl Rains -            Fax: 415-268-7522

Brian Robbins -
SCOTT AND SCOTT, LLC
108 Norwich Avenue
Colchester, CT  06415

Darren Robbins -          Fax: 619-231-7423
Stephen Rodd -            Fax: 212-684-5191
Samuel Rudman -           Fax: 212-868-1229
Jeffrey Russell -   4232  Fax: 314-259-2020
Stuart Savett -           Fax: 215-923-9353
Andrew Schatz -           Fax: 860-493-6290
Steven Schulman -         Fax: 212-868-1229
Michael Schwartz -        Fax: 212-486-2093

David Scott -
SCOTT AND SCOTT, LLC
108 Norwich Avenue
Colchester, CT  06415

Christopher Seefer -      Fax: 415-288-4534
Barry Short -   4358      Fax: 314-241-6056
Jeffrey Smith -           Fax: 212-686-0114
Lee Squitieri -           Fax: 212-684-5191
Robert Stein -            Fax: 312-606-0207
Warren Stern -            Fax: 212-403-2000
Joseph Tabacco -          Fax: 415-433-6382
Curtis Trinko -           Fax: 212-986-0158
Marie Weiner -            Fax: 650-697-0577
Robert Wilson -           Fax: 618-252-5304
Marc Wolinsky -           Fax: 212-403-2000
```

SCANNED & FAXED BY:
JUL X 9 2002
MJM