UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

IN RE BANKAMERICA CORP.    )            NO.: 4:99-MD-1264 (CEJ)
SECURITIES LITIGATION       )

**COMBINED MEMORANDUM OF NATIONSBANK CLASSES LEAD PLAINTIFF AND CLASS REPRESENTATIVE, DAVID P. OETTING, IN OPPOSITION TO GREEN JACOBSON P.C.'S MOTION TO TERMINATE THE CASE, ETC. [777], MEMORANDUM IN OPPOSITION [785], AND IN RESPONSE TO HEFFLER'S REPLIES [787 AND 788]**

COMES NOW NationsBank Classes Lead Plaintiff and Class Representative, David P. Oetting**,** and offers this Memorandum in opposition to Green Jacobson P.C.'S Motion To Terminate The Case, Etc. [777], Memorandum In Opposition [785], and in response to Heffler's Replies [787 and 788], and states the following:

Introduction

Green Jacobson, P.C. (hereinafter sometimes referred to as "Green Jacobson") has submitted one of the most extraordinary and disloyal motions a lawyer could make. [Doc. 777]. Without notice to or agreement of its client, Green Jacobson asks this Court to give its clients' money away to charity instead of its clients; it asks to be relieved of its unfinished duties after receiving $60 million in fees for the work to be done until the end; and it seeks to terminate the clients' case and to receive additional fees for doing so. As rationale, Green Jacobson alleged that Judge Nangle had an undisclosed plan to divert millions of dollars of the victims' money to charity. Regardless of Judge Nangle's intentions, it was clearly Green Jacobson who planned to give their clients' money away—and get paid for doing so.

1

The caption of its motion is misleading in that it calls for three orders. However, the body of the motion adds a fourth, "(4) ***Eliminating*** the office of liaison counsel and allowing Green Jacobson, P.C. to ***cease having any further obligations with respect to this case***". (Emphasis supplied). David P. Oetting ("Oetting"), the class representative for the NationsBank classes, opposes the motion requesting additional fees, the pay out of the surplus pursuant to *cy pres*, the termination the case, and the elimination of the liaison office. Oetting does not oppose ending Green Jacobson's representation of the classes.

I. Green Jacobson is the Moving Party in its Motion, Not the NationsBank Classes.

Contrary to the assertion of Green Jacobson, it is not the NationsBank Classes who make this motion. The captions and opening paragraphs of the motion and brief show that Lead Counsel is taking the action for its own benefit and at the expense of the classes. Green Jacobson requests fees, to be relieved of further responsibility with respect to the case, to terminate the case and to pay out the shareholders' money to three charities that Lead Counsel finds desirable. In short, Green Jacobson wants to cut and run. The caption states that the "NationsBank Classes" are filing the motion. They are not. Instead, the motion is made by Green Jacobson — for the benefit of Green Jacobson.

   *a. No Basis Exists for the Fee Request*

Lead Counsel claims it is entitled to attorneys' fees and expenses in the amount of $98,114.34 for "monitoring a $490 million settlement" for 13 years. Memorandum at p. 10. This is misleading because the bulk of that fund was distributed as of December 2004. See Motion at p. 2 [Doc 777]. Thereafter, the size of the fund has been considerably less, approximately $2.4 million in the NationsBank Fund. Motion at 8 (but note that the figure given on page 5 of the Motion is $2.2 million).

Lead Counsel was not actively working to further the interests of the class for those 13 years. In fact, the delay in distributing the remaining funds can be partially attributed to the failure of Lead Counsel to work on behalf of its clients and successfully resolve this matter earlier. For example, Lead Counsel has taken on an antagonistic and adversarial role with respect to Lead Plaintiff Oetting. The result is that much time was spent on this matter by Lead Counsel not aimed at benefitting the client but rather aimed at ignoring and resisting the wishes of its client and the classes. The motion itself refers to this euphemistically, "open issues remained concerning the Penta fraud, possible claims against the claims administrator, and *efforts by a lead plaintiff, David Oetting, to take control of the case to prosecute claims against the claims administrator.*" Motion at 6 (emphasis added).

Likewise, Lead Counsel has thrown up its hands and conceded failure with respect to collecting the funds lost on its watch and Heffler's watch in failing to properly monitor the payment of falsified claims submitted to Heffler. The motion gives the impression that Lead Counsel has spent thirteen years actively protecting the interests of the classes. However, much of that time was spent either ignoring the class representative Oetting or failing to pursue available remedies to collect funds misappropriated while Lead Counsel was apparently asleep at the wheel.

The fees requested by Lead Counsel are not part of any understanding communicated to the NationsBank Classes. The Lead Counsel were awarded some $60 million in fees for handling this case. The lawyers for BankAmerica Class were awarded some $28 million in addition. The total fees were in excess of $88 million. The attorneys have already received fees for the money that they now want to divert to some unrelated charities. Requesting an additional $98,114.34 is, at best, petty. To add insult, Green Jacobson bills all of its time at its alleged

current rates—all the way back 8 years to 2004. When they asked for attorneys' fees from Judge Nangle in 2004, they had substantially lower lodestar rates.

When Judge Nangle entered his Order of June 16, 2008 [Doc 694] dealing with the Lagerveld situation, he heaped praise on Lead Counsel for having achieved such a result of ***"…closely oversee[ing] the processing of Proofs of Claims and the distribution of the Net Settlement Funds to the Authorized Claimants…"***. (Emphasis supplied). While disclosure of their time records now call into question the actual time and effort involved, what is plain is that Judge Nangle did not order or suggest additional attorney's fees at the time. Clearly, Judge Nangle considered it part of their job for which they had been paid $60 million. Now, Green Jacobson wants the Court to rewind four years from Judge Nangle's death in August 2008 and double dip.

     *b. Analysis of time records – what was done?*

Mr. Jacobson finds it "hard to guess" what might be included in this memorandum because of Mr. Jacobson's lack of involvement in the proceedings for the last several years. According to Martin Green's affidavit and accompanying time logs, Mr. Jacobson made ***no time entry*** from March 19, 2007 through October 26, 2009. During the same 2 ½ year period, Martin Green logged just two entries, a grand total of 1.25 hours, and one of the entries, 9/15/08, was for 0.5 hours dictating a "response to Oetting motion" [Doc 697]. The other was on 1/9/09, a status conference ordered by the Court in response to Oetting's motion [Doc 696] complaining that Green Jacobson refused to provide Oetting with various information.

In his affidavit, Mr. Green asserts that, "***We put a great deal of effort into investigating and dealing with this [Penta] situation.***" (Emphasis supplied). Obviously, Messrs. Green and

4

Jacobson did not.[1]  In fact, there is no obvious record of any particular attention being paid to the Penta situation until April 2009, when Mr. Andres did some analysis.  However, at no point did anyone engage in any "investigation"— instead, just a few conversations with Heffler's attorney.  (See Exhibit A, pages 1 and 3, and time logs).  Green Jacobson did not even find it necessary to respond to Oetting for an entire month, August 10, 2009 through September 11, 2009 regarding this inquiry.  (See Exhibit B).  All during this time, Heffler was still in charge of the funds, was being paid fees, and denying liability.   It is obvious why Mr. Jacobson finds it "hard to guess".  As of June 2, 2009, 11:22 a.m., Mr. Jacobson didn't "know much".  He was not in the loop.

More instructive is the fact that Green Jacobson claims fees for a nearly eight year period, December 1, 2004 through April 3, 2012 (Green time logs), the first four of which were while Judge Nangle was still alive.  Prior to his death in August 2008, there was no request for, or order of, additional compensation to or by Judge Nangle.  Perhaps the fact that he had awarded counsel more than $88 million in fees had something to do with that.  Interestingly, more than 70% of the time included in the current fee request Green Jacobson spent was ***before*** Judge Nangle died.  [Doc 777-1].

During the four years following Judge Nangle's death, Mr. Green logged a grand total of 3 hours, or less than one hour per year, while Mr. Jacobson logged a total of 4.1 hours, or slightly more than 1 hour per year.  Mr. Andres bore the largest portion of the work since Judge Nangle died, putting down 87.6 hours (almost 22 hours per year) during the four years following Judge Nangle's death.  This is far less than either Oetting or his counsel in the case against Heffler has spent regarding the Penta matter since 2008.

---

[1] The Penta situation first came to the attention of counsel and Heffler just before Judge Nangle's death in August 2008.

5

*c. What was done to recoup monies lost in the "Penta" situation?*

There is no time record of Green Jacobson ever having spoken with Lou Lappen, the Assistant U.S. Attorney who was in charge of the Penta case. There is no record of Green Jacobson having examined any of the prosecution exhibits in the case or the transcripts of the records made at the sentencing hearings of Penta on November 23, 2009 and March 29, 2010; nor is there any notation of any conversation with Penta's attorney, Anna Durbin. More remarkable is that there is no record of Green Jacobson having reviewed the documents in their possession with respect to Heffler. Most importantly, perhaps, there is no evidence of Green Jacobson's investigation of Heffler's insurance coverage and the claims that are being made and, not being made, against it. Simply put, Green Jacobson is wrong in its self-proclamation of the insurance coverage issues—or at least is presumptuous. The coverage issues are currently before Judge Dubois in Philadelphia, not Martin Green. In retrospect and in view of Oetting's email of September 9, 2009 (Exhibit B), a year after the Penta matter surfaced to Green Jacobson, such absence of investigation constitutes a woeful lack of effort — not a "great deal of effort".

Mr. Green's claim of having "…put *a great deal of effort into investigating and dealing with this [Penta] situation*" is belied by Green Jacobson's reaction to having the motion for supplemental complaint turned down by Order of November 5, 2010. By then, the Penta scheme was more than four years old and two years had passed since counsel was made aware of the situation. Green Jacobson had claimed they entered into a tolling agreement with Heffler (Exhibit E-1) but had never produced it to Oetting.[2] Concerned about the statute of limitations of the claim against Heffler, Oetting pressed for action, (Exhibits E-1, E-2) but Green Jacobson hesitated and clearly refused to proceed. (See Exhibit E, November 18 email exchange). Green

---

[2] In later discussions with Heffler's attorneys in the winter of 2011, it was discovered that the drafted tolling agreement had never been executed.

Jacobson also refused to discharge Heffler. During this period, the settlement funds were losing about $1,500.00 net per month due to bank charges. See Exhibits C-1, C-2 and D analyzing periodic reports [Docs 764, 766, 770, 767, 771, 772, 773, 774, 775 and 776].

The St. Louis case has remained "stasis", as Green Jacobson puts it, largely because Green Jacobson has not been diligent in its representation of the classes. The Penta scheme was going on the entire time Green Jacobson and Heffler were handling the administration of the settlement funds. The fraudulent checks were sent out in 2004 and Heffler and Green Jacobson were clueless until 2008 when the Assistant U.S. Attorney told them. It took until 2010 for Green Jacobson to assert any claim against Heffler and then, only at the prodding of Oetting. (See Exhibit A, p1-2, July 27, 2009). When this Court denied Green Jacobson's supplemental complaint, Oetting decided he had to protect the classes and filed his separate complaint against Heffler in this Court. Oetting had previously petitioned the Court for a special counsel but that was denied.

This Court transferred the case against Heffler filed by Oetting to Philadelphia where it is now pending. The litigation has been active and although the Heffler action has been stayed pending the outcome of the CAMICO action (a declaratory action to decide the insurance coverage issue), Oetting was granted limited *amicus* status to provide the court in the CAMICO action with what that court determined to be "timely and useful" with respect to completion of the record in the CAMICO action. (See CAMICO Doc 36, Court Order, dated July 20, 2012).

The "useful" information consists of data that Lead Counsel failed to investigate. For instance, in the case against Heffler it was discovered that Heffler holds a $19 million judgment against Penta for the benefit of NationsBank classes which has never been reported to this Court; that Heffler paid approximately $1.3 million from its own funds to settle the *Cendant* case (a

7

similar scheme in which funds were taken under Heffler's watch); and that Heffler hired Penta knowing that he did not have the qualifications to be an accountant, and further that during his tenure at Heffler he never attained any of the qualification to be an accountant in the state of Pennsylvania. Apparently Green Jacobson never discovered that there exists significant evidence that there were many employees in the Claims Administration division at Heffler who were called "accountants" but were not, in fact, so qualified despite the fact that they were represented to be such.

Needless to say, the action against Heffler arose because of Green Jacobson's failure to communicate with Oetting, not vice versa. Green Jacobson refused to respond to Oetting's email inquiries about the Heffler claim, failed to inform him of the status of the case, and refused to take action to protect the interests of the class. (See, Exhibits A, B, C-2 Dec 22, 20113:58PM and Doc. 696). Instead, Green Jacobson negotiated and nearly consummated a settlement with Heffler which is considerably less than the $5.879 million lost due to the Penta scheme.

II. The Settlement Fund Should Not Be Distributed At This Time

Lead Counsel has thrown up its hands and conceded failure with respect to collecting the funds lost on its watch through the Penta scheme. It now wants out and for the Court to distribute the settlement funds still on hand to charity. It cites various cases justifying the distribution. However, these cases are inapposite to this situation.

In *Powell*, class counsel produced a remedy that was carefully tailored to benefit the members of the class, as far as possible, and the funds were not misappropriated while counsel stood by idly. 119 F.3d 703 (8th Cir. 1997). The case involved racial discrimination. The *cy pres* doctrine was invoked to set up a scholarship fund that would benefit black students in six specifically designated counties. *Id*. at 705. In this case, the charitable organizations suggested

by Lead Counsel do not hold any connection with the underlying purposes of the lawsuit, as discussed below.  Further, in *Powell* there was no misappropriation of millions of dollars from the fund being "supervised" by class counsel.  Therefore, Lead Counsel in this case cannot point to *Powell* and ask to be treated the way class counsel was treated in that case, because the results obtained by Lead Counsel in this case are far below the targeted and efficient results achieved by class counsel in *Powell*.

*Pennsylvania v. Delaware Valley Citizens' Council* ("*DVCC*") presents an even starker contrast between effective class representation and what was involved in this case.  478 U.S. 546 (1986).  The remedy in DVCC involved forcing the Commonwealth of Pennsylvania to change its emission inspection system.  Pennsylvania declined to do so for several years, requiring class counsel to file multiple pleadings in multiple legal and administrative proceedings to eventually obtain the desired remedy.  Thus, class counsel in *DVCC* was forced to expend substantial time after the judgment was entered, in order to obtain the desired relief from the defendant.  In this case, the defendant did not try to escape payment or otherwise attempt to nullify the judgment.  The efforts by Lead Counsel have been solely focused on supervising and administering a fund that had already been paid, not extracting further and different relief from defendants.  Class counsel in both *Powell* and *DVCC* provided efforts that were vastly different.

The *cy pres* doctrine is appropriate to use when there are unclaimed funds to distribute and the value of the funds does not justify, administratively, the awarding of additional damages to the plaintiffs on a *pro rata* basis.  See, e.g., *In re Airline Ticket Comm'n Antitrust Litig.*, 268 F.3d 619 (8th Cir. 2001).  However, the choice of charitable beneficiary should not be chosen arbitrarily.  In choosing the recipient of a *cy pres* distribution, the court should take into consideration the underlying purpose of the lawsuit, and the indirect prospective benefit of the

class. *Powell*, at 706. Here the lawsuit involved securities and disclosures, and the class members were shareholders of a bank. There is no connection to the Mathew Dickey Boys Club of St. Louis, or the Backstoppers, although those organizations may do good works in and around the St. Louis metropolitan area.

In *Shapira v. City of Minneapolis*, the defendant's unlawful actions involved traffic safety. 2012 WL 1438813 (D.Minn. April 26, 2012). The court struggled with how to distribute a fund of approximately $35,000 to approximately 18,000 plaintiffs. The remedy fashioned by the court was to distribute the money to the Minneapolis Public Schools to be used to pay tuition for driver education classes so teenagers could be safer drivers. *Id*. at 3. In this way, the remedy matches the harm that was at issue in the lawsuit, namely traffic safety. Note that class counsel quotes *Shapira* for the proposition that in some cases, the recipient of a *cy pres* distribution may be "unrelated" to the underlying lawsuit, yet as discussed above the court in *Shapira* did not actually do that. Therefore, such language would be properly classified as *dicta*.

Similarly, in other cases the courts have carefully crafted the relief to help benefit the class itself, even if the class members themselves would be different people. For example, in *Powell* the court set up a scholarship program for minority children to help mitigate earlier racial discrimination, even though the specific scholarship winners may not be identical to those previously suffering from discriminatory practices. Likewise in *Democratic Central Committee of D.C. v. Washington Metro. Area Transit Comm'n*, the court looked for a way to distribute $5 million in a way that would benefit users of mass transit who had been overcharged for fares. 84 F.3d 451 (D.C. Cir. 1996). The court distributed the money to a branch of the transit authority and required that it be used to upgrade its bus inventory. Proper application of the *cy pres*

doctrine does not involve picking worthwhile but unrelated charities out of a hat, as class counsel seems to believe.

It is likely that after the maximum amount of money is returned, in good faith, to the class members that there will indeed be some amount left over in the settlement fund and if, for instance, the amount is less than the cost of distribution to make another distribution, then at that point it would be appropriate to exhaust the fund by a final "*cy pres* "distribution. However, good faith and reasonable diligence should cause this figure to be less than $100,000 rather than something approaching $12,000,000. But see discussion recipients of *cy pres*, supra.

III. <u>Green Jacobson Should No Longer Be Class Counsel And Should Disgorge Fees.</u>

Green Jacobson wants to be relieved of the job of "Liaison Counsel" by simply eliminating the office. Green Jacobson also intends to be relieved of the job of Lead Counsel as well by asking simply to terminate the case. As a predicate, Green Jacobson suggests that the BankAmerica Class will file a similar motion to terminate, etc. as did Green Jacobson. They have not. Green Jacobson simply seeks to resign its involvement in the case. From a practical standpoint, they did so when they got the $88,000,000 in fees.

Keep in mind that Green Jacobson has already been paid $1.291 million for the missing $5.879 million that was never paid to the class and have been paid $838,000 for the $3.817 million in remaining in the settlement funds, for a total impact to shareholders of nearly $2.129 million.[3] Even Green Jacobson has to acknowledge this is a fair sum. Counsel should disgorge these fees since they do not want to have to administer these funds which Judge Nangle expected

---

[3] Green Jacobson's co-counsel may well have received some of these fees, however the same co-counsel must subscribe to Green Jacobson's actions and motion as none of them have filed any pleading contrary to Green Jacobson's actions in the past eight years or more.

11

them to do when he awarded them their fees initially. Now, they propose to end the case and payout whatever there is to charity.

It is longstanding law that a lawyer who abandons a client should disgorge her fees. This is specifically so in contingent fee litigation. In In re Thomasson's Estate, 346 Mo. 911, 917 144 S.W.2d 79, 83 (1940), the Missouri Supreme Court held,

> [I]f the lawyer unjustifiably abandons his client's case before his task is accomplished, he is not entitled to any compensation whatever. [Mills v. Metropolitan Street Railway Co., supra; Blanton v. King, 73 Mo. App. 148; Houck v. Bridwell, 28 Mo. App. 644; Annotations: 52 L.R.A. (N.S.) 381, 45 A.L.R. 1137.] The very nature of the lawyer's profession necessitates the utmost good faith toward his client and the highest loyalty and devotion to his client's interests.

*In accord see*, Mo. Supreme Court Rule 4-1.5(c); *also* Staples v. McKnight, 763 S.W.2d 914 (Tex.App.-Dallas, 1988). While the disgorgement of the entire $88,000,000 fee (or $60,000,000 paid by NationsBank Classes) is beyond the scope of this memorandum, Green Jacobson should at least disgorge the fees attributable to the amount still in the settlement funds and the monies to be recovered from the Penta scheme. Those fees total $2,129,000.[4] The fees, together with the principal amounts, total nearly $12 million for the classes (assuming a total recovery of the missing funds) which is certainly enough to make a sizeable distribution to the victims and pay fees and expenses.

Clearly $12 million is worthy of distribution since the "SECOND" distribution from the BankAmerica fund was a mere $10 million, and the third, denominated as "Final Distribution" was a mere $1,750,000. The second distribution to the NationsBank classes was a mere $4,750,000.

---

[4] $5.879M / [ 1- .18 ] = $7.170M - $5.879M = **$1.291M**
$2.440M + $1.377M / [ 1 - .18 ] = $4.655M - $3.817M = **$838,000**
$1.291M + $838,000 = **$2.129 million**

Further, Lead Counsel proposed to settle the claim against Heffler for the *cy pres* amount, $2.4 million on the theory that the shareholders would be receiving 40% of the lost funds-- and not have to pay Heffler the fee for distributing same.

If it was feasible to distribute the 2008 Judge Nangle distribution in 2009 and it was feasible to pay out the *cy pres* money to shareholders in 2011, why is it impossible now? The class members were defined in 1998. The class should not be adversely affected because their lawyers do not want to bother anymore.

Green Jacobson should be relieved on their duties as requested but the case must remain on going until a final resolution is made in the case against Heffler. New counsel should be appointed to represent the class while the case proceeds.

## IV. Heffler's Position

*a. No Order by this Court has relieved Heffler from its Liabilty*

Heffler attempts to bootstrap itself into a 2004 Order made by Judge Nangle on June 14, 2004 [Doc 630]. Remarkably, it was Heffler who advocated that the question of Heffler's liability rest with Judge Dubois in Philadelphia, not in this Court. Clearly, Heffler is attempting to gain another bite at the apple to change the ruling originally entered by Judge Nangle in June, 2004 rather than "face the music" in Philadelphia.

Even if Heffler is permitted to once again reinterpret the eight year old Order, the Order could not have applied to actions that had not yet occurred. More specifically, the Order could not have contemplated evidence that was not contained in the affidavit submitted by Sincavage on May 14, 2004 [Doc 618]. It should be note that the pertinent checks, i.e. the "Large" checks, were not issued by then and the reconciliation of those checks could not have occurred until

13

months later.  If the reconciliation function had occurred, the fraud may well have been discovered early enough in 2004 to trace and recover the money.

Heffler is simply wrong in its current "spin" of the 2004 Order, as subsequently interpreted, in that it focuses on the word "lawful".  Specifically, the remainder of the clause is, "performance of duties".  The essence of the negligent supervision claim is that Heffler did not perform its duties, nor did the partners who were personally responsible for oversight.  This is shown by the fact that Heffler did not uncover a single fraudulent check.  They missed them all.  In fact they either missed or participated in the creation of the internal documents which implemented the fraudulent payments.  The reasonable inference is that they did not perform as promised-- or ordered by the Court.

Further, the Court's Orders are naturally predicated on what Heffler and counsel represented to the Court.  This occurred on May 14, 2004 [Doc 618], two months before the large checks were issued.  There is no evidence that the Court audited the auditors.  Heffler was the CPA firm that was supposed to count the numbers and Green Jacobson supervised them.  Simply put they failed in their duties, despite telling the Court that they had fulfilled them.

    b.    *The Unaccounted Monies*

Heffler alleges that Green Jacobson has long known about the recovery fund of the approximately $280,000 that is received from the forfeiture proceedings against Penta.  However, in its bi-monthly reports to the Court, the portion dealing with this sum is quite oddly vague compared to the reporting for the primary settlement funds.  Green Jacobson reports only approximate amounts.  Further, Green Jacobson makes absolutely no mention of the $19 million judgment held by Heffler for the benefit of the classes. (See transcript of sentencing hearings.)  This cannot be a simple oversight. Edward Sincavage was present when the court confirmed the

$19 million judgment against Penta and it is, of course, a matter of public record. There must be a reason Green Jacobson did not report it for the past three years.

Heffler also fails to disclose that it made a substantial payment in cash of over a million dollars relative to the *Cendant* case, shortly preceding the filing and transfer of the instant case. In short, Heffler has been playing hide and seek with basic financial information that the Court and the classes are either clearly entitled or should be entitled to under the circumstances.

V. Conclusion

If nothing else is gleaned from this extraordinary motion of Green Jacobson, the Court should finally conclude that Green Jacobson believes that it has no client and are in this case for themselves. The NationsBank Classes and their representatives have been treated as an inconvenience to Green Jacobson, at best.

Green Jacobson's allegation that Heffler is attempting to rob "Peter to pay Peter" is apt in that it is the "victims' own assets", not Heffler's. However, Green Jacobson omits that its attempt to divert its clients' money, i.e., "victims' own assets", to charity in order to terminate the case and relieve them from their duties, and receive additional fees, is equally objectionable.

Instead of eliminating the liaison office and terminating the case, the Court should remove Green Jacobson as class counsel and liaison counsel and disgorge $2,129,000 in fees. The St. Louis case should remain on hold until the Philadelphia litigation is resolved.

Respectfully submitted,

TOMLINSON LAW, LLC

By: /s/ Frank H. Tomlinson
Frank H. Tomlinson
2100 1st Avenue North, Suite 600
Birmingham, Alabama 35203
Tel:    (205) 326-6626

15

Fax: (205) 328-2889
Hilton@tomlawllc.com

Counsel for David P. Oetting

**CERTIFICATE OF SERVICE**

    The filing attorney certifies that on October 23, 2012, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all parties entitled to service.