UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

IN RE BANK OF AMERICA CORP. )
SECURITIES LITIGATION )
) Case No. 4:99-MD-1264 (CEJ)

**MEMORANDUM AND ORDER**

This matter is before the court on the motion of Green Jacobson, P.C., lead counsel for the NationsBank Classes, to terminate the case with respect to the NationsBank classes, pay attorneys' fees, and distribute surplus settlement funds under the doctrine of *cy pres*. Heffler, Radetich & Saitta, LLP (Heffler), the claims administrator, filed a motion to intervene pursuant to Fed.R.Civ.P. 24(b), and opposes lead counsel's motion. David P. Oetting, lead plaintiff and class representative, also opposes lead counsel's motion.

I.  Background

This litigation began as a class action under the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4; plaintiffs alleged losses from misrepresentations in the prospectus and proxy materials provided to shareholders during the 1998 merger of NationsBank and BankAmerica. A global settlement agreement for $490 million was approved by the district court in 2002 [Doc. #571] and affirmed by the court of appeals in 2003. [Doc. # 602]. Distribution of the settlement fund to class members began in 2004, at which time the court specified that any funds remaining after a second distribution would be "contributed to non-sectarian, not-for-profit 501(c)(3) organization(s) as determined by the Court in its sole discretion…" [Doc. # 630 at 3]. In 2008, the second round of distributions was

ordered [Doc. #694], but stayed when it was discovered that an employee of Heffler was defrauding the class. [Doc. # 695]. The stay was lifted in 2009, and the second distribution was completed. [Doc. # 717].

According to the most recent bi-monthly status report filed by lead counsel, after the final distributions and as of November 30, 2012, $2,734,136.69 remained in the NationsBank fund and $1,376,188.20 in the BankAmerica fund. [Doc. #795]. This surplus results from several factors, including the inability to locate recipients, duplicate payments, restitution from a fraudulent scheme, and the accumulation of interest. Lead counsel suggests the surplus funds be distributed *cy pres* in the following proportions to three charitable organizations that operate in St. Louis or the eastern Missouri region: 50% to Legal Services of Eastern Missouri, 30% to Matthews Dickey Boys' & Girls' Club, and 20% to The Backstoppers. Lead counsel also moves for attorneys' fees and to close the case for the NationsBank classes.

II.     Discussion

A.      Heffler's Motions to Intervene and Oppose *Cy Pres* Distribution

In order to intervene in a pending action in federal court, the intervenor must have Article III standing. E.g., C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P., No. 4:05-CV-252 (MLM), 2005 WL 3299137, at *2 (E.D. Mo. June 8, 2005) (citing Curry v. Regents of the Univ. of Minnesota, 167 F.3d 420, 422 (8th Cir. 1999)). Standing requires "(1) an injury in fact, which is an invasion of a legally protected interest that is concrete, particularized, and either actual or imminent; (2) causation; and (3) redressability." Curry, 167 F.3d at 422.

Heffler asserts that it will suffer injury if the court closes the case and grants *cy pres* distribution. Heffler is the defendant in a civil action filed in the Eastern District of Pennsylvania, arising from a fraudulent scheme in which one of Heffler's employees,

Christian Penta, and his confederates stole over $5 million from the classes.  <u>Oetting v. Heffler, Radetich & Saitta, LLP.</u>, No. 2:11-CV-4757-JD (E.D. Pa.).  Heffler asserts that it should be released from liability in the Pennsylvania case, and that the *cy pres* distribution should be delayed so that class funds will be available to satisfy any judgment obtained against Heffler.

Heffler contends that it is protected from any liability for the fraud perpetrated by its former employee, citing a June 14, 2004 order which states that "all persons… otherwise involved in the administration… of the Settlement Fund… are released and discharged from any and all claims arising out of such involvement…." [Doc. #630].  In a subsequent order dated October 22, 2009, the court clarified this language.  [Doc. #722].   The 2004 order does not confer upon Heffler any legally protected interest in a declaration of release from liability.[1]

Heffler also lacks any legally protected interest in the surplus funds.  Heffler reasons that, because its own assets will be insufficient to satisfy a judgment rendered in the Pennsylvania case, the surplus funds might be used to make up the difference.  This was suggested in a 2010 settlement proposal between Heffler and the class.  However, as lead counsel points out, "Heffler did not obtain some sort of interest in the NationsBank Classes's [sic] surplus funds merely by reason of lead counsel's willingness to discuss Heffler's proposal with it." Memo in Opp. to Mot. to Intervene [Doc. # 785, p. 8].

Finally,

---

[1] Heffler acknowledges that it is holding approximately $280,000 that was recovered as restitution in the criminal cases, but objects to turning these funds over to the classes if they will become part of a *cy pres* distribution.  These funds belong to the NationsBank Classes and will have to be remitted to them.

The court concludes that Heffler lacks standing to intervene in this matter. Therefore, its motion to intervene will be denied.

### B.      *Cy Pres* Distribution

#### 1.      The Application of *Cy Pres* to the Surplus Funds

*Cy pres* derives its name from the French, *cy pres comme possible*, meaning "as near as possible." In re Airline Ticket Comm'n Antitrust Litig., 268 F.3d 619, 625 (8th Cir. 2001) [hereinafter In re Airline Ticket Comm'n I].  Originally, courts applied *cy pres* to adjust testamentary charitable trusts, to carry out the testator's intentions as nearly as possible when the exact instructions could no longer be executed.  3 NEWBERG ON CLASS ACTIONS § 10:17 (4th ed.).  In its modern incarnation, the doctrine also applies to the distribution of surplus class action settlement funds.  "When distribution of settlement funds to class members is impractical, the court may invoke the doctrine of *cy pres* to distribute class funds to a 'next-best' recipient." In re Am. Tower Corp. Sec. Litig., 648 F.Supp.2d 223, 224 (D.Mass. 2009) (citing In re Airline Ticket Comm'n I, 268 F.3d at 626).  *Cy pres* distribution is permissible "'in cases in which class members are difficult to identify or where they change constantly' or in cases where there are unclaimed funds." In re Airline Ticket Comm'n I, 268 F.3d at 625 (quoting Powell v. Georgia-Pacific Corp., 119 F.3d 703, 706 (8th Cir. 1997)).

In this case, *cy pres* distribution of the remaining funds is appropriate.  All class members submitting claims have been satisfied in full.  Further identification of members for additional distribution would be difficult and costly, considering the time that has passed since the initial distribution.  The beneficial ownership of Bank of America shares changes constantly, so further distribution to the holders of stock would not benefit the individuals who actually suffered harm.  Additionally, *cy pres* distribution was contemplated by the parties; under the settlement agreement,

defendant acknowledged that any surplus would not be returned to it. The court, when approving the initial distribution, specified that any surplus remaining after the second distribution would be distributed to non-profit organizations to be determined by the court. [Doc. # 630].

The only objections are from Heffler (which lacks standing to object, as discussed above), and Oetting, who supports a third, *pro rata* distribution to class members in lieu of a *cy pres* distribution. Oetting's objection ignores several important factors, including the difficulties of beginning a third distribution more than a decade after the settlement and eight years after the initial distributions, and the contemplation by the parties and the court of an eventual *cy pres* distribution of surplus. A third distribution simply would not inure to the benefit of those actually harmed; institutional investors would be the primary recipients of the distribution, and beneficial ownership of the shares has shifted over time. In addition, Oetting's objection rests upon his misguided belief that the surplus amounts to $12 million. Oetting's estimate is based on a faulty premise that, *first*, assumes total recovery of funds involved in the Penta fraud and, *second*, contemplates that lead counsel will disgorge a portion of the legal fees awarded in 2002, as a penalty for "abandoning" their clients. In reality, the NationsBank surplus is approximately $2.7 million dollars, and this sum may be properly distributed according to the doctrine of *cy pres*.

    2.    Recipient of the *Cy Pres* Distribution

Lead counsel for the NationsBank Classes recommend that the surplus be divided among three charitable organizations: Legal Services of Eastern Missouri, Inc., Matthews Dickey Boys & Girls Club, and Backstoppers, Inc. In selecting the appropriate recipient of the funds, the court has carefully considered the most important requirement of *cy pres*: "the unclaimed funds should be distributed for a

purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated." In re Airline Ticket Comm'n Antitrust Litig., 307 F.3d 679, 682 (8th Cir. 2002) [hereinafter In re Airline Ticket Comm'n II].  See also In re Am. Tower Corp., 648 F.Supp.2d at 225 ("Disbursement of unclaimed funds must have some relationship to the harm suffered by class members."). The Eighth Circuit requires courts to tailor the distribution to match both the purpose and the geographic scope of the original litigation. This preserves the legal fiction that class members themselves are receiving an indirect benefit from the *cy pres* distribution.

Thus, in Powell v. Georgia-Pacific Corp. 119 F.3d 703 (8th Cir. 1997), the Eighth Circuit affirmed a district court's *cy pres* distribution as properly tailored. In Powell, the district court had distributed the surplus funds from a Title VII race discrimination class action to a foundation providing scholarships to black students living in counties where most class members lived. The Eighth Circuit agreed that a *cy pres* distribution was appropriate, considering the length of time elapsed since the initial distribution and the difficulty of distributing funds to additional class members, and approved of the recipient foundation as a "second-best" solution. Id. at 706-707.

By contrast, the Eighth Circuit twice reversed a district court's *cy pres* distribution as an abuse of discretion, when the purpose and the geographic scope of the distribution did not align with that of the original litigation. The surplus remained from a nationwide antitrust class-action against airlines arising from the fixing of commissions paid to travel agents on airline tickets. Initially, the Minnesota district court distributed unclaimed funds to law schools and charitable institutions in Minneapolis. The Eighth Circuit reversed and remanded, with instructions "to make a distribution or distributions more closely related to the origin of this nation-wide class

action concerning caps on commissions paid to travel agencies." In re Airline Ticket Comm'n I, 268 F.3d at 626. On remand, the district court distributed the funds to the National Association for Public Interest Law (NAPIL). The Eighth Circuit again reversed, emphasizing that while the first award to charitable institutions in Minnesota "failed to consider the full geographic scope of the case," the second award to the national foundation still ignored "the importance of tailoring a *cy pres* distribution to the nature of the underlying lawsuit." In re Airline Ticket Comm'n II, 307 F.3d at 683. It is important to note that, when reversing the distribution to NAPIL, the Eighth Circuit had another recipient in mind: "travel agencies in Puerto Rico and the U.S. Virgin Islands were clearly the next best recipients of the funds…. [These agencies], although not members of the class, were subject to the same allegedly unlawful caps…. In contrast… NAPIL cannot claim any relation to the substantive issues in this case." Id.

The geographic scope of the instant case is clear; as lead counsel points out, the multi-district litigation was transferred to this district because much of the harm suffered by the class was felt by individuals in the St. Louis region. Therefore, a *cy pres* distribution to a regional organization is proper. However, unlike in Powell or In re Airline Ticket Comm'n, there is no immediately apparent organization that will indirectly benefit NationsBank and BankAmerica class members. This is because "the great majority of the financial interest in the settlement was held by the largest shareholders of the former NationsBank. These shareholders are some of the largest investment entities in the United States. *There are no charities that benefit the interests of these very wealthy entities.*" Brief in Supp. of Mot. to Terminate [Doc. # 778, p. 7]. Although distribution to a legal services organization was improper in the case of In re Airline Ticket Comm'n, where the other travel agencies were clearly a

more precise fit with the purpose of the litigation, in the instant case a legal services organization is the "second-best" recipient.

A distribution of surplus settlement funds to a legal aid organization is especially fitting in a securities fraud class action, because the *cy pres* distribution will assist future victims of fraud. As a New York court distributing surplus from a securities fraud class action to a legal aid organization explained, "[t]he intent of the settlement fund was to help those claiming injury by civil securities fraud. The Legal Aid Society Civil Division exists for the at least somewhat analogous purpose of helping those needing legal assistance for various civil matters. The tie to the intent of the fund is thin, but not as thin as it would be if the donation served an entirely unconnected cause…." Jones v. Nat'l Distilleries, 56 F.Supp.2d 335, 359 (S.D.N.Y. 1999). Distribution of the surplus to Legal Services of Eastern Missouri will at least support the organization's efforts to vindicate the rights of victims of fraud and deter future fraudulent schemes. Therefore, the Court concludes that it is appropriate to distribute the surplus in its entirety to Legal Services of Eastern Missouri.

The two other organizations suggested by lead counsel both provide valuable services to the eastern Missouri community. Matthews Dickey Boys & Girls Club assists low-income youth, providing recreational, social, and educational services. Backstoppers, Inc. supports families of police officers and firefighters killed in the line of duty. Nevertheless, neither of these worthy causes is related to the underlying purpose of this securities fraud class action. There is some authority suggesting that a *cy pres* distribution to an unrelated charity is permissible, and that when "second-best" is not available, "third-best" will suffice. See, e.g., Kansas Ass'n of Private Investigators v. Mulvihill, 159 S.W.3d 857, 861 (Mo. Ct. App. 2005) ("Using the funds for a purpose closely related to their origin is the best *cy pres* application, although the

funds may go to other, unrelated charities if a closely related one cannot be found."); Shapira v. City of Minneapolis, No. 06-CV-2190-MJD-SRN, 2012 WL 1439913, at *2 (D. Minn. April 26, 2012) ("Under the broad equitable powers that underlie the distribution of *cy pres* funds… courts may distribute these funds to benefit a public interest, even if that interest is unrelated to the plaintiff's original claims."). However, it is the judgment of this court, guided by Eighth Circuit precedent, that distribution to an organization that serves a purpose completely unconnected to that of the litigation does not meet the requirements of *cy pres,* especially when a distribution to a different organization presents a closer fit.

Therefore, the NationsBank surplus funds will be distributed *cy pres* to Legal Services of Eastern Missouri. This distribution shall include all funds acquired in future litigation or otherwise from Heffler, as well as the $280,000 recovered from Penta and held in escrow by Heffler. The distribution shall exclude the attorneys' fees granted to lead counsel.

    C.    **Attorneys' Fees**

Attorneys' fees were awarded to lead counsel for NationsBank in 2002. At that time, counsel requested an award of 25% of their clients' $333.2 million recovery. [Doc. #573]. After considering both the "lodestar" and the "percentage of recovery" approach to the calculation of attorneys' fees, the court, in an order dated October 15, 2002, concluded that an 18% award from the net common fund of the NationsBank class would be an appropriate and reasonable fee for lead counsel. [Doc. #575, p. 3]. Lead counsel were directed to provide the court with monthly reports of distributions from the accounts, and the case was closed. Id. at 16. After the case was reopened in 2004, lead counsel were again directed to file reports on the status of the distributions. [Doc. # 638]. From 2004 to the present, lead counsel have performed

a variety of tasks related to this case for which they seek compensation. Specifically, lead counsel seek $98,114.34, less than 4% of the $2.7 million NationsBank surplus, for 317.30 hours of services.

As previously noted in the 2002 order granting attorneys fees, "[w]hen attorneys make a claim for fees from a common fund… their interest is adverse to the interest of the class in obtaining recovery because the fees come out of the common fund set up for the benefit of the class. This divergence of interests requires a court to assume a fiduciary role in reviewing fee applications…" [Doc. #575, p. 2]. Although the remainder of the common fund will be distributed only for the indirect benefit of class members, the court will apply the same scrutiny to counsel's request for additional fees.

In support of their motion for attorneys' fees, lead counsel point to Powell, in which the Eighth Circuit held that plaintiffs' counsel was equitably entitled to additional fees because of the expense counsel incurred overseeing the final *cy pres* distribution. The Eighth Circuit stated that "the work performed in this proceeding is analogous to postjudgment monitoring of a consent decree, which is a compensable activity for which counsel is entitled to a reasonable fee." Powell, 119 F.3d at 707 (internal quotations omitted). The court agrees that lead counsel are entitled to a reasonable fee, to supplement the fee granted in 2002. The complexities of this case were unforeseeable at that time, and it would be unjust to deny lead counsel recompense for nearly a decade of additional effort and involvement in this case.

The court has examined the affidavit of Martin Green, president of Green Jacobson, P.C., detailing the involvement of the firm in this case from 2004 to 2012. Lead counsel interacted with institutional investors that failed to submit claims on behalf of the beneficial owners of the stock, investigated the two fraudulent schemes

targeting this class action, and submitted regular status reports to the Court. See Aff. of Martin Green [Doc. #777-1, p. 3-5]. Attached to the affidavit is a billing report, recording the work of the attorneys at Green Jacobson on these matters. After considering the material submitted, the court concludes that a fee of $98,114.34 is reasonable and equitable in this case.[2]

Oetting objects to lead counsel's motion for attorneys' fees as an attempt to "double dip" and to dupe the court into granting unwarranted additional fees. See Mem. of Oetting in Opp. to Lead Counsel's Mot. [Doc. #790, p. 4-6]. The court finds that these allegations have no basis in fact. Oetting also demands that lead counsel disgorge approximately $2 million of the fees paid in 2002 as a penalty for "abandoning" the class. Id. at 12. However, counsel's moving to terminate this case, which settled a decade ago, does not constitute abandonment. Lead counsel have continued to represent the class through a minefield of unforseen complications. The second distribution is complete, and the case should be closed. Therefore, the court rejects Oetting's call for disgorgement.

D.     Termination of Case

The second distribution to class members is complete, and *cy pres* distribution of the surplus will be ordered. Therefore, this case will be closed with respect to the NationsBank classes only.

Accordingly,

**IT IS HEREBY ORDERED** that the motion of Green Jacobson, P.C., as lead counsel for the NationsBank Classes, for attorneys' fees and for *cy pres* distribution of surplus settlement funds [Doc. #777] is **granted**.

---

[2] The lodestar was calculated using current hourly rates, in order to compensate lead counsel for the delay in payment.

**IT IS FURTHER ORDERED** that Green Jacobson, P.C., as lead counsel for the NationsBank Classes, is awarded attorneys' fees in the amount of $98,114.34, to be paid from the NationsBank Classes settlement fund.

**IT IS FURTHER ORDERED** that the balance of the NationsBank Classes settlement fund shall be distributed *cy pres* to Legal Services of Eastern Missouri, Inc.

**IT IS FURTHER ORDERED** that Heffler, Radetich & Saitta, LLP shall immediately remit to the NationsBank Classes the money recovered through restitution in the criminal cases and presently held in escrow in the approximate amount of $280,000. This money and all other monies owed to the NationsBank Classes that are recovered in the future shall be distributed *cy pres* to Legal Services of Eastern Missouri, Inc. Lead counsel may seek an award of reasonable attorneys' fees and costs expended in recovering the funds.

**IT IS FURTHER ORDERED** that lead counsel's motion to terminate the case with respect to the NationsBank Classes [Doc. #777] is **granted**.

**IT IS FURTHER ORDERED** that the motion of Heffler, Radetich & Saitta, LLP to intervene [Doc. #781] is **denied**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 24th day of June, 2013.